**UNITED STATES of America,**

v.

**Jeffrey STEIN, et al., Defendants.**

**No. S1 05 Crim. 0888(LAK).**

United States District Court,
S.D. New York.

June 20, 2007.

Craig D. Margolis, Vinson & Elkins L.L.P., David Spears, Richards Kibbe & Orbe, LLP, Michael James Madigan, Akin, Gump, Strauss, Hauer & Feld, LLP, Leon Rodriguez, Ober, Kalen, Grimes & Shriver, Ernest Lawrence Barcella, Paul, Hastings, Janofsky & Walker, LLP, James K. Robinson, Michael Horowitz, Michelle Rose Seltzer, Cadwader Wickersham & Taft LLP, John N. Nassikas, III, Arent Fox PLLC, Joseph Ray Price, Arent Fox PLLC, Washington, DC, Christopher Schulten, Robert Henry Hotz, Jr., Akin, Gump, Strauss, Hauer & Feld, L.L.P., Robert Steven Fink, Caroline Rule, Fran Obeid, Kostelanetz & Fink, LLP, Stanley Samuel Arkin, Elizabeth Ann Fitzwater, Arkin Kaplan Rice LLP, Ronald E. Depetris, Marion Joyce Bachrach, Depetris & Bachrach, LLP, Alexandra A. E. Shapiro, Latham & Watkins LLP, Jack S. Hoffinger, Susan D. Hoffinger, Hoffinger Stern & Ross LLP, Stuart Edward Abrams,

Frankel & Abrams, Leif Thorsten Simonson, Michael Sangyun Kim, Kobre & Kim LLP, Diana Davis Parker, John Russell Wing, Lankler Siffert & Wohl LLP, Deborah Salzberg, Paul, Hastings, Janofsky & Walker LLP, John Francis Kaley, Doar, Rieck & Mack, James R. Devita, Bryan Cave LLP, J. Bruce Maffeo, J. Bruce Maffeo, Esq., Russell Michael Gioiella, Litman, Asche Lupkin, Gioiella & Bassin, LLP, Priya Chaudhry, Law Offices of Priya Chaudhry, Susan Rose Necheles, Hafetz & Necheles, Martin Joel Auerbach, Martin J. Auerbach, Esq., David B. Pitofsky, Richard Mark Strassberg, Goodwin Procter, LLP, New York City, Christopher Tarpy Schulten, Alan J. Harris, P.C., Pleasantville, NY, Joseph V. Diblasi, Joseph V. Diblasi, Esq., Kew Gardens, NY, Stephen Charles Willey, Savitt & Bruce LLP, Seattle, WA, Steven Mark Bauer, Karli E. Sager, Latham & Watkins, LLP, George Dominic Niespolo, Kathryn Emily White, Stephen Holbrook Sutro, Duane Morris LLP, San Francisco, CA, David C. Scheper, Diann H. Kim, Overland Borenstein Scheper & Kim LLP, Los Angeles, CA, Cristina Claypoole Arguedas, Ted Walter Cassman, Arguedas, Cassman & Headley LLP, Michael W. Anderson, Law Office Michael. Anderson, Berkeley, CA, Ann Carol Moorman, M. Todd Welty, Meadows Owens et al., Dallas, TX, John Abney Townsend, Townsend & Jones, LLP, Houston, TX, Gregory Vega, Patrick Quinn Hall, Seltezer Caplan Mcmahon Vitek, San Diego, CA, Lee David Foreman, Pamela Robillard Mackey, Haddon, Morgan, Mueller, Jordan, Mackey & Foreman, P.C., Denver, CO, for Defendants.

## MEMORANDUM AND ORDER

KAPLAN, District Judge.

Russell M. Gioiella, Esq., and the firm of Litman, Asche & Gioiella, LLP ("LAG")

move to be relieved as counsel to defendant Carl Hasting on the grounds that Mr. Hasting has failed to comply with their retainer agreement, that he is more than $95,000 in arrears in payment of fees, and that the strained attorney-client relationship that has developed requires counsel's departure from the representation. Mr. Hasting has submitted a declaration in opposition to the motion. He argues, among other things, that he has a negative net worth, is in debt for more than $1.5 million, lacks sufficient income to meet his family's monthly expenses and that, "as bad as [his] circumstances with Mr. Gioiella are at this point, [he] must respectfully oppose his request to be removed from the case." [1]

*Facts*

*The Retainer*

Mr. Hasting retained LAG to handle the USAO investigation and any criminal charges that might ensue. He agreed to pay an initial retainer of $200,000 against hourly time charges of $500 for partners' time, $250 for associates' time, and $150 for paralegals' time. He further agreed to deposit an additional $500,000 in the LAG escrow account on or before November 30, 2005 to secure payment of fees and expenses over and above the initial $200,000 and to restore the balance in the escrow account to $500,000 or more whenever the balance fell below $250,000. He represented that a substantial portion of the $500,000 escrow deposit would be obtained from the sale of a second home or, if the house did not sell promptly, from the proceeds of a second mortgage he would obtain on the security of the house. Finally, he agreed to bring the escrow deposit

---

1. *Counsel sought leave, on notice to the government, to file the motion papers ex parte* and under seal. *The government did not oppose this relief, which the Court then granted.*

balance up to $500,000 or more at least one month prior to a scheduled trial. And while it is not mentioned in the retainer agreement, Mr. Gioiella says that Mr. Hasting informed LAG that he could afford to pay fees up to a maximum of $1.5 million, but probably could not pay more than that. LAG nevertheless agreed to the representation on the basis that it would take the risk that it would have to wait until after conclusion of the criminal trial to collect any balance above that figure.

### Mr. Hasting's Financial Situation

Mr. Hasting paid the initial $200,000 retainer. He never paid the full $500,000 escrow deposit, although he borrowed $300,000 from his employer's parent company, HSBC, of which he paid $125,000 to LAG. All or most of the balance, as well as all or most of the proceeds of the sale of the second home, went to satisfy part of an outstanding liability to the Internal Revenue Service. Mr. Hasting then lost his job and, although his parents have paid $100,000 to LAG, they have not fulfilled previous assurances of additional financial assistance.

At this point, Mr. Hasting's financial circumstances appear to be dire. According to a balance sheet he submitted, as of March 1, 2007, he had $60,000 in cash, owned a house with equity of less than $45,000, and owed almost $400,000 to HSBC and on his credit card. His net worth and cash flow are substantially negative. The monthly payments on the mortgages on the house and the HSBC loan exceed his projected monthly income.

Based on the information before me, I provisionally find that Mr. Hasting lacks the ability to pay Mr. Gioiella's fees or, for that matter, to retain any private counsel

to handle this case. LAG does not dispute this.[2]

### Mr. Gioiella's Situation

Mr. Gioiella is a partner in LAG, a firm that has three partners and one associate. In a sealed declaration filed *ex parte* without objection from the government, he stated that he does not share in the profits of the firm. Rather, his income consists of the fees collected on his matters less his share of the firm's collective expenses. Thus, all or substantially all of the risk of non-payment of the cost of Mr. Hasting's defense, should the motion to withdraw be denied, would fall on Mr. Gioiella personally.

As of January 2007, LAG's bills to Mr. Hasting exceeded the amounts paid to it by more than $95,000. That figure doubtless is higher today. The cost of defending Mr. Hasting from this point forward, assuming the agreed hourly rates, certainly would exceed $1 million and quite likely exceed $1.25 million, taking into account a 6 to 8 month trial, preparation time, the need for the assistance of at least one other lawyer, copying, and all of the other necessary expenses.

### The Relationship Between Messrs. Hasting and Gioiella

There has been considerable acrimony between Messrs. Hasting and Gioiella, all of it relating to and born of the failure of Mr. Hasting to comply with the retainer agreement. Some fairly ugly things have been said by Mr. Hasting. But it is important to put all of this in context.

Mr. Hasting is, and for some time has been, under huge pressure. He is facing a very serious indictment. He has lost his job. Since he was fired, he has been unemployed and, for all practical purposes, is

2. "[W]e do not doubt that, currently, [Mr. Hasting] does not have the resources to ade-

quately fund a defense." Gioiella Decl. 2.

unemployable. Such income as he earns comes from preparing tax returns for those former clients who have hired him individually. He has a wife and five children to support and has been wiped out financially as a result of the commencement of this case. The fact that he has lashed out unjustifiably at Mr. Gioiella is understandable, even though the predicament in which he finds himself is not of Mr. Gioiella's making. Moreover, Mr. Hasting wants Mr. Gioiella to continue the representation and has assured me that he could work with Mr. Gioiella in a civil and cooperative manner if the motion to withdraw were denied.

Mr. Gioiella's frustration is equally understandable. He took on an engagement in the expectation that he would be paid as agreed. He feels that Mr. Hasting has paid monies to the IRS and to another lawyer (who he retained to pursue a claim against KPMG for payment of Mr. Gioiella's fees) that should have come to him. But he has conducted himself professionally toward Mr. Hasting at all times despite the financial strain that Mr. Hasting's failure to pay places upon him.

In all the circumstances, I am persuaded that the relationship between Messrs. Hasting and Gioiella is not irreparable.

## Discussion

■ The first question presented is whether non-payment of fees and failure to comply with the retainer agreement justify withdrawal. The Second Circuit recently addressed this in *United States v. Parker*, 439 F.3d 81, 104 (2d Cir.2006), where it wrote:

"A client's refusal to pay attorney's fees may constitute 'good cause' to withdraw." *See, e.g., McGuire v. Wilson*, 735 F.Supp. 83, 84 (S.D.N.Y.1990) (collecting cases). In most cases, however, courts have permitted counsel to withdraw for lack of payment only where the client either 'deliberately disregarded' financial obligations or failed to cooperate with counsel. *Id.* 'Non-payment of legal fees, without more, is not usually a sufficient basis to permit an attorney to withdraw from representation.' *In re Albert*, 277 B.R. 38, 50 (Bankr.S.D.N.Y. 2002) (quoting *In re Revere Armored, Inc.*, 131 F.3d 132, 1997 WL 794460, at *3 (2d Cir.1997) (unpublished decision)). Moreover, the exhaustion of a retainer is not evidence of a deliberate violation. *See In re Meyers*, 120 B.R. 751, 753 (Bankr.S.D.N.Y.1990).

" 'New York State courts interpreting the Code of Professional Responsibility have reached similar results.' *McGuire*, 735 F.Supp. at 84 (collecting cases). Indeed, the disciplinary rules of the Code permit a lawyer to withdraw from representing a client for the non-payment of fees only if the client '[d]eliberately disregards an agreement or obligation to the lawyer as to expenses or fees.' N.Y.Code of Prof'l Responsibility D.R. 2–110(C)(1)(f) (emphasis added). Moreover, the ethical considerations of the Code advise that the '[f]ull availability of legal counsel requires ... that lawyers who undertake representation complete the work involved.' *Id.* at E.C. 2–31; *see also id.* at E.C. 2–32 ('A decision by a lawyer to withdraw should be made only on the basis of compelling circumstances and, in a matter pending before a tribunal, the lawyer must comply with the rules of the tribunal regarding withdrawal.')."

Mr. Gioiella makes a colorable argument that Mr. Hasting disregarded his obligations when he paid funds derived from the sale of his second home and the HSBC loan to the IRS and the lawyer representing Mr. Hasting in his effort to force KPMG to pay Mr. Gioiella's fees. In the last analysis, however, I am not entirely

persuaded. I take the distinction between mere non-payment and deliberate disregard of obligations to suggest that deliberate disregard occurs when the client has the ability to pay fees, but declines to do so. Certainly a solvent client who simply elects not to pay an obligation to an attorney deliberately disregards that obligation. Whether the same should be said of someone in Mr. Hasting's position, however, is not so clear. Payment of the IRS presumably was necessary to stave off coercive collection options available to the Service. It is hard to fault Mr. Hasting for using some of the funds available to him to pursue KPMG in an effort to force it to pay for his defense in this case. But I ultimately find it unnecessary to reach a definitive resolution of this question. While deliberate disregard of financial obligations may permit a court to relieve an attorney of a representation, there is no reason to suppose that it necessarily requires that an attorney be relieved, regardless of other circumstances. So I must consider the entire situation.

As an initial matter, it is appropriate to take into account the course that brought Mr. Gioiella to his current situation. He acknowledges that he knew that a defense of Mr. Hasting through trial could cost over $1.5 million. He nevertheless agreed to take on the representation upon payment of only $200,000 and relied upon unsecured promises of further funds to come, both from Mr. Hasting and from his parents. He did not even obtain any written commitment by the parents.

In agreeing to represent Mr. Hasting on this basis, Mr. Gioiella took a number of risks. These included the risks that Mr. Hasting would lose his job, the risk that the second home would not sell at all and that Mr. Hasting's circumstances would not permit borrowing on it, and the risk that the parents would not honor what Mr.

Gioiella thought were commitments. Of course, I do not fault him for being a trusting person. But in considering what now should be done, I do consider the extent to which a more careful or prudent approach to the retainer agreement might have avoided the current problem. Mr. Gioiella certainly could have insisted upon a security interest in the second home and a guarantee from Mr. Hasting's parents.

■ Second, I cannot ignore the fact that Mr. Gioiella has obligations not only to Mr. Hasting, but to the Court. "Attorneys are officers of the court, and are bound to render service when required by ... appointment" to represent those in need of representation. *Powell v. Alabama*, 287 U.S. 45, 73, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Indeed, they are obliged to so even over their objection and without fee. *E.g., Immediato v. Rye Neck School Dist.*, 73 F.3d 454, 459 (2d Cir.1996) ("[A] state may require an attorney to work pro bono."); *United States v. Accetturo*, 842 F.2d 1408, 1412–15 (3d Cir.1988) (district court within its power and discretion to order local counsel to assume defendant's representation when trial counsel fell ill in the middle of months-long trial; discussing, *inter alia,* Judge Leval's compulsion of an attorney, over his objection, to represent a defendant in the so-called "Pizza Connection" case, which involved a 17–month trial). Given the fact that Mr. Gioiella undertook this representation, knowing that his prospects for full payment were unsecured and inherently somewhat uncertain, the Court has a heightened interest in his finishing what he started.

Finally, it must be recognized that the economic loss to Mr. Gioiella of remaining in the case, even if were entirely uncompensated, would not necessarily be the full projected cost of the defense going forward, assuming this were valued at the contracted hourly rates. There can be no

assurance that Mr. Gioiella, were he now relieved, would find paying work at the rate that Mr. Hasting agreed to pay fully equal to the amount of work that he would be required to devote to Mr. Hasting's defense.

None of this is to say that I am insensitive to Mr. Gioiella's plight. The loss of income that he is likely to suffer if his motion were denied would be substantial. Even without much personal financial information, I would be disinclined to impose this burden upon him, notwithstanding what has been said above, if there were no way to mitigate the impact. There is, however, a means to ease the burden.

Every indication now before the Court suggests that Mr. Hasting is "financially unable to obtain adequate representation" within the meaning of the Criminal Justice Act, 18 U.S.C. § 3006A (the "CJA"), and Section VI of this Court's Revised Plan for Furnishing Representation Pursuant to the Criminal Justice Act (the "Plan"). Were he to submit a sufficient financial affidavit under the Plan, the Court would appoint counsel for him. While Mr. Gioiella is not a member of the panel of attorneys ordinarily eligible for CJA appointment, Mr. Gioiella's familiarity with this complex case would constitute "good cause shown which renders in it the interests of justice that counsel who is not ... a member of the CJA Panel be assigned...." Plan § VII.D. Accordingly, I would be disposed to appoint Mr. Gioiella to represent Mr. Hasting were such an application made, to authorize interim fee payments, and to certify that a waiver of the maximum limits on counsel fees is necessary to provide fair compensation. *Id.* § IX.B.[3] I would consider also making such appointment retroactive to March 1, 2007, or earlier, upon an appropriate showing, *see* 18 U.S.C. § 3006A(b); *United States v. Yousef,* 395 F.3d 76, 78 (2d Cir.2005), and appointing a second attorney to assist in the defense.

*Conclusion*

There is no happy answer to the problem before me. In all of the circumstances, the motion for leave to withdraw is denied. This ruling is without prejudice to renewal if Mr. Hasting, despite a request by Mr. Gioiella that he do so, declines to apply for appointment of counsel under the CJA and to file the requisite financial affidavit by July 3, 2007 or if the Court determines that Mr. Hasting is not eligible for appointment of CJA counsel.

SO ORDERED.

---

**3.** I recognize that Mr. Gioiella's appointment under the CJA would foreclose his acceptance of anything of value from, or on behalf of, Mr. Hasting (Plan § VIII.E.), and thus presumably preclude his collection of his agreed fees for services rendered during the period of any CJA appointment were Mr. Hasting subsequently to be in a position to pay either as a result of a reversal in his fortunes or by prevailing on a claim against KPMG for indemnification. Mr. Gioiella might prefer to go forward without a CJA appointment and thus to retain his rights to seek recovery from Mr. Hasting under the retainer agreement. The choice of whether he does so, however, must be made by him.