**UNITED STATES of America,**

v.

**Jeffrey STEIN, et al., Defendants.**

**No. S1 05 Crim. 0888(LAK).**

United States District Court,
S.D. New York.

July 16, 2007.

John M. Hillebrecht, Rita M. Glavin, Kevin M. Downing, Margaret Garnett, Assistant United States Attorneys, Michael J. Garcia, United States Attorney, David Spears, Spears & Imes LLP, Craig D. Margolis, Vinson & Elkins LLP, for Defendant Jeffrey Stein.

Michael J. Madigan, Robert H. Hotz, Jr., Akin Gump Strauss Hauer & Feld LLP, for Defendant John Lanning.

Robert S. Fink, Caroline Rule, Fran Obeid, Kostelanetz & Fink, LLP, for Defendant Richard Smith.

Stanley S. Arkin, Joseph V. DiBlasi, Elizabeth A. Fitzwater, Arkin Kaplan Rice LLP, for Defendant Jeffrey Eischeid.

Ronald E. DePetris, Marion Bachrach, DePetris & Bachrach, LLP, for Defendant Philip Wiesner.

Steven M. Bauer, Karli E. Sager, Latham & Watkins, LLP, for Defendant John Larson.

David C. Scheper, Overland Borenstein Scheper & Kim LLP, for Defendant Robert Pfaff.

John R. Wing, Lankler Siffert & Wohl LLP, Diana D. Parker, Law Offices of Diana D. Parker, for Defendant Larry De-Lap.

John F. Kaley, Doar Rieck Kaley & Mack, for Defendant Steven Gremminger.

Cristina C. Arguedas, Ted W. Cassman, Michael W. Anderson, Arguedas, Cassman & Headley, LLP, Ann C. Moorman, Law Offices of Ann C. Moorman, for Gregg Ritchie.

George D. Niespolo, Stephen H. Sutro, Duane Morris LLP, for Defendant Randy Bickham.

Michael S. Kim, Leif T. Simonson, Kobre & Kim LLP, Attorneys for Defendant Mark Watson.

James R. DeVita, Bryan Cave LLP, John A. Townsend, Townsend & Jones LLP, for Defendant Carol Warley.

Russell M. Gioiella, Richard M. Asche, Litman, Asche & Gioiella, LLP, for Defendant Carl Hasting.

Susan R. Necheles, Hafetz & Necheles, for Defendant Richard Rosenthal.

Richard M. Strassberg, David B. Pitofsky, Goodwin Procter LLP, for Defendant David Greenberg.

## OPINION

KAPLAN, District Judge.

## Table of Contents

I.   Introduction ................................................................ 394

II.  The Factual Bases of the Court's Constitutional Holdings ...................... 394
     A.   The Thompson Memorandum ............................................. 395
          1.   The Text ....................................................... 396
          2.   The Bar's Understanding of the Thompson Memorandum .............. 397
               (a)  Former U.S. Attorney General Edwin Meese III ............... 397
               (b)  KPMG Lead Counsel Robert Bennett .......................... 398
               (c)  ABA President Karen J. Mathis ............................. 398
               (d)  The American College of Trial Lawyers ..................... 398
               (e)  The United States Chamber of Commerce: .................... 399
               (f)  Law Review Articles ....................................... 399
     B.   The Thompson Memorandum and the USAO's Actions Caused KPMG to
          Limit and Then Cut Off Payment of Fees .............................. 400
          1.   The Thompson Memorandum Influenced KPMG Even Before the
               February 25, 2004 Meeting Took Place ........................... 400
          2.   KPMG Made No Decisions Until After the February 25, 2004
               Meeting ........................................................ 401
               (a)  KPMG Made No Decisions Before the Meeting Even as to Costs
                    of Representing Employees During the Investigation ......... 401
               (b)  The Decision Not to Pay the Defense Costs of Any Employees
                    Who Were Indicted Came Even Later .......................... 403

3.  There Was Ample Evidence that KPMG Would Have Paid the Fees of Most of these Defendants Absent Government Interference.....405
4.  New Evidence that KPMG Would Have Paid Absent Government Interference...............................................407

III.  The Due Process Arguments ...............................................409
    A.  The KPMG Defendants' Pattern Argument ..............................410
    B.  The Legal Standard...............................................411
    C.  The Actions of the USAO "Shock the Conscience" .........................412

IV.  The Impact on the KPMG Defendants ......................................415
    A.  Deprivation of Counsel of Choice .......................................415
    B.  The Other Practical Consequences ......................................416
        1.  The Scope and Nature of this Case .................................416
            (a)  Discovery .......................................416
            (b)  Motion Practice ...................................418
            (c)  Trial ...........................................418
            (d)  Subject Matter ...................................418
        2.  The Limitations on the Defense ...................................418

V.  Remedy ...............................................................419
    A.  The Government's CJA Argument .......................................419
    B.  Defendants Deprived of Counsel of Choice ................................421
    C.  The KPMG Defendants as to Whom the Government Concedes Dismissal.....423
    D.  The Defendants as to Whom the Government Resists Dismissal .............425
        1.  Defendants Pfaff and Larson ......................................425
        2.  Defendant Greenberg............................................426

VI.  Conclusion ............................................................427

The government threatened to indict, and thus to destroy, the giant accounting firm, KPMG LLP ("KPMG"). It coerced KPMG to limit and then cut off its payment of the legal fees of KPMG employees. KPMG avoided indictment by yielding to government pressure. Many of its personnel did not. They now await trial, four of them deprived of counsel of their choice and most of the others unable to afford the defenses that they would have presented absent the government's interference.

This Court previously held that the government's interference with KPMG's payment of the legal fees of its employees and former employees violated the employees' constitutional rights. The government now concedes that thirteen of the sixteen individuals formerly employed by KPMG (the "KPMG Defendants") are entitled to dismissal, assuming that this Court's previous ruling was correct. But the government does not concede the correctness of that ruling.[1] Accordingly, the Court has reconsidered *Stein I* carefully in light of the government's arguments. It remains convinced that the ruling was correct. Indeed, additional evidence not previously considered strongly supports the Court's decision. The government, however, now has focused for the first time on the specific circumstances of certain of these defendants. The Court concludes that three of

---

1.  In an appeal from another decision in this case, the government challenges certain of the Court's factual findings as clearly erroneous and disputes its legal conclusions. Appellant's brief ("Govt. App. Br."), *United States v. Stein*, No. 06–3999 (2d Cir. filed Nov. 16, 2006) 46 *et seq.* Citations herein to "A" and

"SA" refer, respectively, to the Joint Appendix and Supplemental Appendix filed with the Second Circuit in this appeal.

Citations herein to "K," "U," and "DX" refer to documents introduced into evidence at the fee hearing.

the defendants have not established that KPMG would have paid their defense costs even if the government had left KPMG to its own devices. The indictment therefore will be dismissed as to thirteen of the sixteen KPMG Defendants. The case will proceed to trial on the charges against the other three as well as two additional defendants who never were employed by KPMG and whose rights therefore were not violated.

## I.  Introduction

The indictment charges nineteen defendants, seventeen of them formerly partners or employees of KPMG, with conspiracy and tax evasion.[2] It asserts also that KPMG, which entered into a deferred prosecution agreement with the government, was an unindicted co-conspirator.

This Court held in *Stein I*[3] that the government violated the Fifth and Sixth Amendment rights of the KPMG Defendants by causing KPMG to depart from its prior practice of paying the legal expenses of KPMG personnel in all cases in which they were sued in consequence of their activities on behalf of the firm. It found that KPMG would have paid those expenses—whether legally obliged to do so or not—but for the government's improper actions. The Court, however, deferred the request of the KPMG Defendants to dismiss the indictment, reasoning that dismissal might prove inappropriate if KPMG were obligated to advance the defense costs. In that case, all or much of the

harm caused and still threatened by the government's actions might be remedied or avoided. The Court held that it had ancillary jurisdiction over the KPMG Defendants' claims against KPMG for advancement of defense costs and permitted the assertion of those claims in this case.[4] The Court of Appeals, however, recently held that this Court lacks ancillary jurisdiction with respect to the fee advancement claims against KPMG.[5] Other efforts to resolve this question have failed.[6] In consequence, the matter is before the Court on the renewed applications of the KPMG Defendants to dismiss the indictment on the basis of the government's violations of their constitutional rights. Before proceeding to the question of remedy, however, the Court first addresses the government's principal attack on *Stein I,* its claim that the decision rests on clearly erroneous findings of fact.

## II.  The Factual Bases of the Court's Constitutional Holdings

The government challenges three pivotal factual findings upon which *Stein I* rests, viz.:

- "[T]he Thompson Memorandum caused KPMG to consider departing from its long-standing policy of paying legal fees and expenses of its personnel in all cases and investigations even before it first met with the [United States Attorney's Office ("USAO")]. As a direct result of the threat to the firm

---

2. Three defendants are charged also with obstruction in violation of 26 U.S.C. § 7212 and 18 U.S.C. § 2.

 One of the nineteen, a former KPMG employee, has pleaded guilty.

3. *United States v. Stein,* 435 F.Supp.2d 330 (S.D.N.Y.2006).

4. *Id.* at 377–78.

5. *Stein v. KPMG, LLP,* 486 F.3d 753 (2d Cir. 2007).

6. The Court months ago referred KPMG and the KPMG Defendants to the Honorable Miriam Goldman Cedarbaum for the purpose of exploring the possibility of settling the claims of the KPMG Defendants against KPMG for advancement of their defense costs in this case. That effort was unsuccessful. The Court nevertheless is grateful to Judge Cedarbaum for her characteristically gracious, skilled and determined effort.

inherent in the Thompson Memorandum, it sought an indication from the USAO that payment of fees in accordance with its settled practice would not be held against it." [7]

- "[T]he USAO did not give KPMG the comfort it sought. To the contrary, it deliberately ... reinforced the threat inherent in the Thompson Memorandum. It placed the issue of payment of legal fees high on its agenda for its first meeting with KPMG counsel, which emphasized the prosecutors' concern with the issue. [Assistant United States Attorney ("AUSA")] Weddle raised the issue [at the February 25, 2004 meeting] and then repeatedly focused on KPMG's 'obligations,' thus clearly implying—consistent with the language of the Thompson Memorandum—that compliance with legal obligations would be countenanced, but that anything more than compliance with demonstrable legal obligations could be held against the firm. [AUSA] Neiman's statement, in response to a comment about payment of legal fees by KPMG, that misconduct should not be rewarded quite reasonably was understood in the same vein, whatever its intent. And Mr. Weddle's colorful warning that the USAO would look at any discretionary payment of fees by KPMG 'under a microscope' drove the point home." [8]

- "KPMG's decision to cut off all payments of legal fees and expenses to anyone who was indicted and to limit and to condition such payments prior to indictment upon cooperation with the government was the direct consequence of the pressure applied by the Thompson Memorandum and the USAO. Absent the Thompson Memorandum and the actions of the USAO, KPMG would have paid the legal fees and expenses of all of its partners and employees both prior to and after indictment, without regard to cost." [9]

## A. The Thompson Memorandum

The government argues first that the Court misinterpreted the Thompson Memorandum. The Memorandum did not, the government contends, discourage payment of legal fees for company employees by increasing the risk of indictment of a company under investigation that chooses to make such payments.[10] The Court disagrees. Not only is the Court's reading of the document correct, and in any case certainly well within the bounds of its role as fact finder,[11] but it is a reading shared

---

7. *Stein I*, 435 F.Supp.2d at 352.

8. *Id.* at 352–53.

9. *Id.* at 353.
   The Court, although it would have reached the same result and made the findings summarized above in *Stein I* in any case, found also that "the government," as evidenced in part by the Thompson Memorandum as well as certain actions by the USAO, "conducted itself in a manner that evidenced a desire to minimize the involvement of defense attorneys." *Id.* The Court has reconsidered that finding in light of the government's recent arguments and adheres to it.

10. *See* Govt. App. Br. at 47–56.

11. Even if the document were ambiguous, and it is not, the resolution of that ambiguity would present a question of fact committed to the trial judge. *See K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996) ("Where there are alternative, reasonable constructions of a contract, *i.e.*, the contract is ambiguous, the issue 'should be submitted to the trier of fact.' ") (quoting *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir.1993)); *Easton v. Pub. Citizens, Inc.*, No. 91 Civ. 1639(JSM), 1991 WL 280688, at *2 (S.D.N.Y. Dec.26, 1991) ("[I]f the Court finds that the wording in the [documents] is ambiguous, then the finder of fact must determine how to interpret it.") (citing *Davis v. Ross*, 754 F.2d 80, 82–83 (2d Cir.1985)).

by the Bar in general and KPMG's counsel in particular.

### 1. The Text

The Thompson Memorandum, before it was superseded following *Stein I*,[12] made cooperation with a government investigation a factor to be considered in deciding whether to indict a corporation or other business entity. It stated that "[i]n gauging the extent of the corporation's cooperation, the prosecutor may consider the corporation's willingness to identify the culprits within the corporation, including senior executives; to make witnesses available; to disclose the complete results of its internal investigation; and to waive attorney-client and work product protection."[13] It then went on to say:

> "Another factor to be weighed by the prosecutor is whether the corporation appears to be protecting its culpable employees and agents. Thus, while cases will differ depending on the circumstances, a corporation's promise of support to culpable employees and agents, *either through the advancing of attorneys fees*, through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a

joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation."[14]

The Thompson Memorandum thus made clear that advancing attorneys' fees to personnel of a business entity under investigation, except where such advances were required by law, might have been viewed by the government as protection of culpable individuals and thus contribute to a government decision to indict the entity.

The government nevertheless argues that there was no evidence that the Thompson Memorandum discouraged companies from paying employees' legal fees by increasing the perceived risk of indictment for companies that did so.[15] It suggests that there was no reason to believe that the defense bar—including KPMG's counsel—ever read the Thompson Memorandum to convey such a threat.[16] Indeed, it argues that "none of the prosecutors read the Thompson Memorandum in this way."[17] They construed the document, the government says, to mean that "the payment of legal fees [wa]s considered only when the Government believed such payments were part of an effort to 'circle the wagons,' an effort to appear cooperative while protecting culpable employees."[18]

---

12. On December 12, 2006, the Department of Justice ("DOJ") issued a revised version of the Thompson Memorandum, known as the McNulty Memorandum. Under the guidelines set forth in the McNulty Memorandum, "[p]rosecutors generally should not take into account whether a corporation is advancing attorneys' fees to employees or agents under investigation and indictment," with exceptions to occur only in "extremely rare cases." McNulty Memorandum at 11 & n. 3, *available at* http: //www.usdoj.gov/dag/speeches/2006/mcnulty—memo.pdf.

13. Thompson Memorandum at 6, *available at* http://www.usdoj.gov/dag/cftf/business—organizations.pdf.

14. *Id.* at 7–8 (emphasis added, footnote omitted).

> It contained also the following footnote: "Some states require corporations to pay the legal fees of officers under investigation prior to a formal determination of their guilt. Obviously, a corporation's compliance with governing law should not be considered a failure to cooperate." *Id.* at 8 n. 4.

15. Govt. App. Br. 47–48.

16. *See id.* at 52–53.

17. *Id.* at 51.

18. *Id.*

The Thompson Memorandum is inconsistent with the government's argument. It says clearly that, "depending on the circumstances, a corporation's . . . advancing of attorneys fees" could be viewed as "protecting its culpable employees and agents." The government's "circle the wagons" gloss simply is not in the text. Any competent lawyer reading the document would regard a corporate client that was under investigation as being at greater risk of indictment if it advanced legal fees to employees who might be viewed by prosecutors as culpable than if it did not advance legal fees. That is the plain meaning of the language.[19] The Justice Department itself undoubtedly recognized this when, following *Stein I*, it changed it in the McNulty Memorandum.[20] But this reading of the plain language of the document is supported by far more.

### 2. The Bar's Understanding of the Thompson Memorandum

There can be no serious doubt that the Bar, as the Court properly inferred from the text of the Thompson Memorandum and the testimony of KPMG's then-deputy general counsel,[21] read the Thompson Memorandum as discouraging payment of legal fees for company employees under investigation by holding out the prospect that doing so would increase the risk of indictment. This view is supported by an abundance of published statements and literature, including

*(a) Former U.S. Attorney General Edwin Meese III:*

"Even if no prosecutor ever mentions [waiving attorney-client privilege and cutting off payment of employees' attorney fees] to a company, the fact that the Thompson Memorandum requires federal prosecutors to take all nine of its factors into consideration when deciding whether to indict a business organization necessarily places great pressure on the company to take these two steps. As the Thompson Memorandum itself emphasizes, a 'prosecutor generally has wide latitude in determining when, whom, how, and even whether to prosecute' a business organization. The company and its counsel know that the prosecution team will eventually go through each of the nine factors point by point. Any outright 'No' in response to whether the company has cooperated with one

---

**19.** This appears to be the view taken by the only other decision to have addressed the question, where the district court, though finding no constitutional violation on the facts, stated that its determination was "in no way an endorsement of the Thompson Memorandum policy directive with respect to an organization's payment or advancement of attorney fees for employees who are targets or subjects of criminal investigations. Indeed, that policy is unquestionably obnoxious in general and is fraught with the risk of constitutional harm in specific cases." *United States v. Rosen*, 487 F.Supp.2d 721, 737 (E.D.Va.2007).

**20.** *See* supra note *11*.

**21.** Joseph Loonan testified as follows:
"Q. Okay. From the time when you first got involved in the investigation and began at KPMG, did you have an understanding that KPMG was going to need to cooperate in the government's investigation in order to have a chance of avoiding indictment? A. It was my understanding that the government's guidelines expected entities to cooperate in investigations.
"Q. Did you understand that that was one of the factors that the Department of Justice would consider in deciding whether to indict KPMG? A. Yes.
"Q. Did you understand that one aspect of cooperation that was specifically spelled out in the Thompson memo was the company's attitude toward payment of legal fees for persons who are accused by the government of wrongdoing? [colloquy omitted] A. Yes." Tr., May 8, 2006 (Loonan) 134:2–18.

of the factors will be glaringly apparent." [22]

*(b) KPMG Lead Counsel Robert Bennett:*

"[T]he Thompson memorandum makes clear that corporations that cooperate in the prosecution of employees stand a greater chance of avoiding corporate indictment.

\* \* \*

"Where . . . it appears that criminal conduct occurred, it generally is advisable to not advance fees. Indeed, to do so may be construed by the government as a lack of cooperation by the corporation, an impediment to its investigation, and an indication of a failure of corporate responsibility." [23]

*(c) ABA President Karen J. Mathis:*

"[T]he Thompson Memorandum encourages prosecutors to deny cooperation credit to companies and other organizations that assist or support their so-called 'culpable employees and agents' who are the subject of investigations by . . . providing or paying for their legal counsel." [24]

*(d) The American College of Trial Lawyers:*

"Defense counsel and their clients increasingly find government resistance to corporate efforts to advancing attorneys' fees to individual employees once a government investigation has been commenced. Although individuals under investigation or charged by the government are entitled to obtain qualified, independent counsel without interference from the government, federal prosecutors frequently object to a corporation providing counsel for its employees and penalizes [sic] the company for not cooperating with the government investigation.

\* \* \*

"[T]he guidance recently issued to federal prosecutors in the Holder Memo Standards [[25]] could, and does, generate interference with the principle that non-government employees facing government investigation or prosecution are entitled to qualified, competent representation. Today, it is common for defense counsel to be confronted by a federal prosecutor who believes that a corporation is not fully cooperating with the government in a federal criminal investigation solely because the corporation is paying the legal fees for an officer, director or employee." [26]

---

**22.** Edwin Meese III, Statement Before the United States Senate Committee on the Judiciary Regarding the Thompson Memorandum's Effect on the Right to Counsel in Corporate Investigations (Sept. 12, 2006) ("Meese Senate Statement"), *available at* http://judiciary.senate.gov/testimony.cfm?id=2054 & wit—id=5741.

**23.** Robert S. Bennett et al., *The Role of Internal Investigations in Defending Corporations Against Charges of Foreign Bribery* (Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C.), 2005 at 17, 19, *available at* http://skaddenpractices.skadden.com/fcpa/index.php?documentID=28 & sectionID=32.

**24.** Karen J. Mathis, Statement Before the Committee on the Judiciary of the United

States Senate Concerning the Thompson Memorandum's Effect on the Right to Counsel in Corporate Investigations (Sept. 12, 2006), *available at* http://judiciary.senate.gov/testimony.cfm?id=2054 & wit—id=5742.

**25.** The part of the Holder memorandum addressed here was identical to the corresponding part of the Thompson Memorandum. Tr., May 9, 2006 (Neiman) 266:7–11.

**26.** American College of Trial Lawyers, *The Erosion of the Attorney–Client Privilege and Work Product Doctrine in Federal Criminal Investigations*, 41 Duq. L.Rev. 307, 331, 335 (2003).

*(e) The United States Chamber of Commerce:*

"Federal investigators often object to the payment by corporations of the legal fees for their employees. The Thompson memorandum specifically identifies advancement of legal fees to employees as a negative factor when deciding whether a company has cooperated with the government. This policy deals a serious blow to the ability of employees to vindicate their legal rights without suffering financial ruin." [27]

*(f) Law Review Articles:*

Law review articles echo this understanding of the Thompson Memorandum. One article, written shortly after the Thompson Memorandum issued, bluntly framed the dilemma facing corporations:

"The renewed emphasis [of the Thompson Memorandum] on total, quick, and effective cooperation leaves little doubt that any corporation posturing itself for leniency in the form of non-prosecution should consider a contingency plan early on in the process of an internal investigation that contemplates ... carefully examining governing law on indemnification of legal representation expenses and the advancing of attorneys fees to employees that become subjects of the government's inquiry. . . .

\* \* \*

"The Thompson Memo seems to create an uncomfortable choice for the corporation: cooperate (i.e., turn over all witness interviews and other evidence gathered during the course of the internal investigation, make employees available to the government for witness interviews, desist from entering into joint defense agreements with employees, *refrain from advancing legal fees to employees that may have violated [the] law*, and discipline employees that may have violated the law) and hope to escape indictment, or close ranks and prepare the defense. *The four corners of the policy leave little room for compromise between these bipolar extremes.*" [28]

---

27. United States Chamber of Commerce, Testimony Before the American Bar Association Task Force on Attorney–Client Privilege (Feb. 22, 2005), *available at* http://www.abanet.org/buslaw/attorneyclient/publichearing20050211/testimony/chamberofcommerce.pdf.

28. Lawrence D. Finder, *Internal Investigations: Consequences of the Federal Deputation of Corporate America*, 45 S. Tex. L.Rev. 111, 116–17 (2003) (emphasis added); *see also* Peter J. Henning, *Targeting Legal Advice,* 54 Am. U.L.Rev 669, 699 (2005) (noting that the Thompson Memorandum's fee advancement factor means "a corporation that does not immediately turn on a potentially culpable employee has not cooperated and may suffer an indictment itself"); Petra M. Reinecke & Douglas R. Schwartz, *The Perils, Pitfalls and Possible Demise of the Joint Defense Agreement in the Context of Shipboard Criminal Investigations and Prosecutions,* 17 U.S.F. Mar. L.J. 29, 40–41 (2005) ("Both the Holder and Thompson Memoranda specifically authorize a prosecutor to view the advancement of legal fees for 'culpable' employees as lack of cooperation by the company, and to factor this into the decision as to whether to charge the company. Since a decision to retain counsel and advance legal fees to its [employees] often must be made long before there is a sufficient factual basis upon which to assess the individual's 'culpability,' the prosecutorial standards unfairly prejudice the company, impermissibly chill the individual's right to independent counsel, and directly contravene statutes enacted by the vast majority of states expressly authorizing, or even requiring, advancement of legal fees to corporate agents and employees.") (footnotes omitted); Carmen Couden, Note, *The Thompson Memorandum: A Revised Solution or Just a Problem?*, 30 J. Corp. L. 405, 420 (2005) ("[T]he Thompson Memorandum poses difficulties for employees who contracted for the company's payment of their legal fees in the event of a lawsuit. . . . Once the company is forced to withdraw its support, its employees are left to fend for themselves in any ensuing legal battles that may develop.") (footnotes omitted).

* * *

In sum, KPMG and its counsel knew from the Thompson Memorandum, even before they first communicated with the USAO, that the payment of the legal fees of KPMG employees, in the absence of a legal obligation to do so, would increase the risk of indictment of the firm, as prosecutors might view that action as protecting culpable employees. So the Court turns to the government's next contention, viz. that KPMG conditioned and then cut off payment of legal fees entirely on its own, "not cowed by" the Thompson Memorandum and the actions of the USAO.

**B.** *The Thompson Memorandum and the USAO's Actions Caused KPMG to Limit and Then Cut Off Payment of Fees*

The government argues that KPMG formulated its own policy on payment of attorneys fees—the government had nothing to do with it. *"KPMG,"* it asserts, "began the [February 25, 2004] meeting by volunteering that the firm had decided to change course and now intended to cooperate fully and completely, and later announcing its intention to 'not pay legal fees for employees who declined to cooperate with the Government,' but to pay otherwise." [29] In other words, "even assuming that the USAO communicated . . . 'that it did not want KPMG to pay legal fees,' the evidence is uncontested that KPMG, apparently not cowed by any such communication, ignored that desire and went ahead and paid the fees, subject to terms and conditions of its own devising." [30] The government's argument is unpersuasive.

*1. The Thompson Memorandum Influenced KPMG Even Before the February 25, 2004 Meeting Took Place*

As an initial matter, the contention that the Thompson Memorandum had no effect on KPMG's actions cannot be squared with the evidence or with the government's concession to this Court.

The record fully establishes KPMG's specific and entirely understandable desire to do whatever it could to come within the Thompson Memorandum's definition of a cooperative company. [31] As KPMG's new chief legal officer, former U.S. District Judge Sven Erik Holmes, testified in a civil deposition received in evidence in the fee hearing, he thought it indispensable "to be able to say, at the right time with the right audience, we're in full compliance with the Thompson Guidelines." [32] Anything less, as former Attorney General Meese told the Senate Judiciary Committee, "might well have constituted legal malpractice." [33] It therefore is hardly surprising that the government expressly conceded in its closing argument at the fee hearing that the Thompson Memorandum influenced KPMG's decisions on legal fees:

"[AUSA] WEINSTEIN: I don't think anybody is disputing that the Thompson memo as a whole had an influence on

---

**29.** Govt. App. Br. at 57 (emphasis in original).

**30.** *Id.*

**31.** Among other things, despite the fact that KPMG had entered into a severance agreement with defendant Stein that expressly obligated the firm to pay his defense costs, DX 6, ¶ 13 [SA6–7]; *Stein I,* 435 F.Supp.2d at 339, it ultimately cut off payments because, according to Joseph Loonan, then KPMG's deputy general counsel, KPMG "thought it would help [the firm] with the government." Tr., May 9, 2006 (Loonan) 196:13–23; *see also Stein I,* 435 F.Supp.2d at 347–48. There was no evidence of anything that might have given KPMG that idea except the Thompson Memorandum and the actions of the USAO.

**32.** Stein Mem. [dkt. item 544] Ex. B, at 74–75.

**33.** Meese Senate Statement.

their [i.e., KPMG's] decisions with respect to the legal fees.

\* \* \*

"So if we are asking whether there was an influence from the Thompson memo, of course, because the company was doing anything it could to cooperate." [34]

### 2. KPMG Made No Decisions Until After the February 25, 2004 Meeting

The government argues that the USAO's actions, as distinguished from the Thompson Memorandum alone, had nothing to do with KPMG's limitation and cut-off of legal fees because KPMG decided on its course before the initial February 25, 2004 meeting with the USAO. It contends, in other words, that KPMG formulated its own position, free of the USAO's influence. But there are fundamental flaws in its argument.

### (a) KPMG Made No Decisions Before the Meeting Even as to Costs of Representing Employees During the Investigation

The government's challenge to the findings about the February 25 meeting rests on its assertion that *"KPMG began the meeting by volunteering that the firm had decided to change course and now intended to cooperate fully and completely, and later announcing its intention to 'not pay legal fees for employees who declined to cooperate with the Government,' but to pay otherwise."* [35] The implication is that KPMG had made up its mind even before it first met with the USAO. But the government's account of the meeting is misleading, and its implication is incorrect.

It is quite true, as the government argues,[36] that KPMG's attorney, Mr. Bennett, began the meeting by saying that KPMG had decided to change course and cooperate fully. Contrary to the government's suggestion, however, those remarks were directed to KPMG's high-level personnel changes and the importance of avoiding indictment of the firm. Mr. Bennett said nothing at that point about payment of legal fees. So the implication that KPMG opened the meeting by volunteering that it had decided upon a new course with respect to payment of legal fees is incorrect. The subject of legal fees first was raised by AUSA Weddle, acting according to the plan the prosecutors made before the meeting.

When Mr. Weddle did raise the issue, KPMG did not initially respond by volunteering that it would pay fees only for employees who cooperated with the government. Rather, Mr. Bennett met Mr. Weddle's question with a question. He asked for the government's view on the subject.[37] The notes of Mr. Pilchen, a Skadden Arps lawyer at the meeting, demonstrate this clearly:

"Weddle-*wants p'ship agreement, by-laws*. Are u paying fees for partners/ees? Are you obligated

"RCB [Mr. Bennett]—ur view on the subject?" [38]

It is not difficult to see what was going on here. Mr. Bennett and KPMG well understood the Thompson Memorandum and the risk that the government would regard payment of employee legal fees as protection of culpable individuals. They thus knew that payment of legal fees for individuals could increase the risk of in-

---

**34.** Tr., May 10, 2006, at 399:16–19, 400:9–11.

**35.** Govt. App. Br. 57 (emphasis in original).

**36.** *Id.* at 29.

**37.** Tr., May 8, 2006 (Pilchen) 23:8–12.

**38.** K313 [A1338] (emphasis in original).

dictment of the firm. But refusal to pay legal fees was problematic for KPMG. The government stipulated:

> "Prior to February 2004, . . . it had been the longstanding voluntary practice of KPMG to advance and pay legal fees, without a preset cap or condition of co-operation with the government, for counsel for partners, principals, and employees of the firm in those situations where separate counsel was appropriate to represent the individual in any civil, criminal or regulatory proceeding involving activities arising within the scope of the individual's duties and responsibilities as a KPMG partner, principal, or employee." [39]

Moreover, as Mr. Bennett later explained to the government, departing from this practice "would be a big problem" for KPMG because the firm was a partnership.[40] The inference is compelling that Mr. Bennett's response to Mr. Weddle was an attempt to sound out the USAO as to whether payment of legal fees by KPMG for employees caught up in the investigation would be held against the firm.

It is undisputed also that the government gave KPMG no comfort. To the contrary, Ms. Neiman rejected Mr. Bennett's feeler, saying "that the government would take into account KPMG's legal obligations, if any, to advance legal expenses, but referred specifically to the Thompson Memorandum as a point that had to be considered." [41] Only then did KPMG say anything about paying legal fees only for

employees who cooperated with the government, itself a partial retreat from its "common practice" of paying in all cases. Even that was a trial balloon, not the announcement of a decision. The Skadden lawyers emphasized that no decisions had been made.[42] But Ms. Neiman and Mr. Weddle were not favorably disposed. Ms. Neiman said that " 'misconduct' should not or cannot 'be rewarded,' " and Mr. Weddle followed up by emphasizing that any payment of legal fees would be "look[ed] at . . . under a microscope." [43]

Mr. Pilchen's notes show all this. After noting Mr. Bennett's comment about paying fees only for those who cooperated, they say:

> "SP [Mr. Pilchen]—*No decisions made. No counsel have been recommended. We have had discussions @ what the firm does in typical situations—but no final decisions made.*
>
> "SN [Ms. Neiman]—*misconduct shdn't be rewarded.*
>
> "JW [Mr. Weddle]—*if u have discretion re fees—we'll look at that under a microscope.*" [44]

The logical inference, and the one the Court drew and draws, is that KPMG came into the meeting hoping to continue its past practice of paying employee legal fees. Anything else, in Mr. Bennett's words, would have been "a big problem" because KPMG was a partnership. In view of the Thompson Memorandum, how-

---

**39.** *Stein I*, 435 F.Supp.2d at 340.

**40.** U30 [A1146].
The implication was that management had to be at least somewhat responsive to the voting partners of the firm, many of whom might have viewed cutting off fees to their colleagues with disfavor because it would set a precedent that was a potential threat to every member of the firm.

**41.** *Stein I*, 435 F.Supp.2d at 341.

**42.** Tr., May 8, 2006 (Okula) 79:25–80:10, 107:2–7, 124:19–23; U116, ¶ 26 [A1199]; K313 [A1338].

**43.** *Stein I*, 435 F.Supp.2d at 342–44.

**44.** K313–14 [A1338–39] (italics supplied, underscoring in original).
It bears mention that Mr. Weddle never denied having made the statement.

ever, KPMG understandably was reluctant to do so without an indication from the USAO that such payments would not be held against the firm. Ms. Neiman declined to give that indication. So KPMG tentatively suggested a possible fallback position—payment of legal fees only for employees who cooperated with the government by, among other things, waiving the Fifth Amendment—while emphasizing that it had made no decisions.[45] Even that, however, did not receive a warm reception from the USAO, which asked KPMG to get back to it once it determined what its obligations were,[46] a reference to the Thompson Memorandum's statement that payment of legal fees beyond a company's legal obligations could be viewed as a lack of "cooperation." There is no credible evidence that KPMG made any decisions at all about payment of employee legal expenses before the February 25 meeting ended.[47]

Mr. Bennett first got back to the government on March 2 to give what AUSA Weddle described in a contemporaneous e-mail as KPMG's *preliminary view* on legal fees."[48] He said that KPMG was "planning on . . . putting a cap on fees" and conditioning their payment for any given partner or employee on that individual "cooperating fully with the company and the government."[49] But AUSA Weddle stated under oath that Mr. Bennett

told him on this occasion that no final decision had been reached.[50]

In short, KPMG's statements at the February 25 meeting about a possible new policy concerning legal fees were not announcements of decisions already made, let alone decisions that the firm had made free of government interference. KPMG was bidding against itself in an auction in which the Thompson Memorandum set out the rules, the USAO was both the seller and the auctioneer, and the lot on the block was avoidance of an indictment of the firm. The decisions all were made after the February 25 meeting.

### (b) The Decision Not to Pay the Defense Costs of Any Employees Who Were Indicted Came Even Later

KPMG's definitive response on attorneys' fees came on March 11, 2004, when Skadden's Mr. Rauh sent the government a sample form letter to KPMG employees. The form letter stated that KPMG would pay an individual's legal fees and expenses, up to a maximum of $400,000, on the condition that the individual "cooperate with the government and . . . be prompt, complete, and truthful."[51] Most importantly, the letter added something new, something that had not even been mentioned at the February 25 meeting. It said that "*payment of . . . legal fees and expenses will cease immediately if . . . [the recipient] is*

---

45. Indeed, Mr. Bennett tried to sell this idea to the government on the theory that it would be helpful to the prosecutors, stating that "[h]e would recommend law firms [for individual employees] that were familiar with these types of proceedings and who understood that cooperation with the government was the best way to proceed." *See* U119, ¶ 56 [A1202].

46. U106 [A1189].

47. Of course, as *Stein I* noted, Skadden representatives made statements about what they would do or were considering doing with

respect to fees. But the evidence is clear, as Mr. Okula testified, that they also stated no final decision had been made. Tr., May 8, 2006 (Okula) 79:25–80:10; *see also* supra note *41*.

48. U30 [A1146] (emphasis added); *see also* Tr., May 8, 2006 (Okula) 89:12–90:9.

49. U30 [A1146].

50. Weddle Decl. [dkt. item 435] ¶ 3.

51. K15 [A1214].

*charged by the government with criminal wrongdoing.*"[52] This was the first mention to the government, so far as the record reveals, of any intention to cut off payment of legal fees to anyone who was indicted.[53]

The Court finds that KPMG's decision to cut off payment of any legal expenses to anyone who was indicted—which is the critical point here[54]—was prompted by the Thompson Memorandum and the USAO's negative reaction at the February 25 meeting to the possibility that KPMG would pay any legal fees in the absence of a legal obligation to do so. The record thus does not bear out the government's argument that KPMG, "apparently not cowed by any [indication that the government did not want KPMG to pay legal fees], ignored that desire and went ahead and paid the fees, subject to terms and conditions of its own devising."[55]

The fact that KPMG paid legal fees of its employees and former employees during the pre-indictment investigation—as long as they did what the government asked and waived the Fifth Amendment—does not support the government. The government ultimately was perfectly happy to have KPMG do so because the threat of cutting off even those payments gave KPMG, and therefore the government,

leverage over the recipients. As the government said in summation at the fee hearing:

"[T]here are two ways the company could get their people in. One is they could hold over their head their job. The other is they could cut off their legal fees. If it's a former employee, the first one isn't even relevant. So regardless of whether there is a reference in the Thompson memo for legal fees, that is all the company can do to get its people in."[56]

But the critical fact remains that KPMG refused to pay the fees of these defendants *after they were indicted* as a result of the Thompson Memorandum and the actions of the USAO.

The government nevertheless persists in arguing that the Court's causation finding was clearly erroneous because no one from KPMG said that the Thompson Memorandum and the USAO's actions precipitated the decision.[57] This argument too is unpersuasive.

There was no need for direct evidence of the reasons for KPMG's decision. The evidence as a whole more than supports the Court's finding. Moreover, the government was on ample notice that the reasons that KPMG acted as it did were to be tried at the hearing.[58] Yet it called no witnesses to testify as to when, how, and

---

**52.** K16 [A1215] (emphasis added).

**53.** As will appear, the very first mention of the possibility of cutting off payment of legal fees to anyone who was indicted came in a meeting at KPMG following its attorneys' first meeting with the USAO on February 25, 2004. *See infra* page 408.

**54.** *Stein I* held that the constitutional violation pertinent to possible dismissal of the indictment was the government's role in KPMG's action in cutting off payment of legal fees for those who were indicted as distinct from the limitations on payment of legal fees during the investigative stage. *See* 435 F.Supp.2d at 373. In *United States v. Stein,* 440 F.Supp.2d 315 (S.D.N.Y.2006) ("*Stein II* "), the Court held also that the government

coerced proffers made by defendants Smith and Watson by inducing KPMG to pay pre-indictment legal fees only for employees who cooperated with the government and waived the Fifth Amendment and, in the case of Smith, threatening to fire him.

**55.** Govt. App. Br. 57.

**56.** Tr., May 10, 2006, at 400:2–8.

**57.** Govt. App. Br. 63–66.

**58.** The order that set the evidentiary hearing that preceded *Stein I* stated that "[t]he issues for consideration [at the hearing would be] *whether the government, through the Thompson memorandum or otherwise, affected*

why KPMG made the decisions it did. The reason it did not do so is the elephant in the room that the government tries to ignore.

In a letter to the Court three days before the start of the hearing, KPMG represented:

"categorically that the Thompson memorandum *in conjunction with the government's statements relating to payment of legal fees* 'affected KPMG's determination(s) with respect to the advancement of legal fees and other defense costs to present or former partners and employees....' In fact, KPMG is prepared to state that the Thompson memorandum substantially influenced KPMG's decisions with respect to legal fees...." [59]

In view of this statement, it is not surprising that the government adduced no evidence to challenge the defense contention that the Thompson Memorandum and the USAO's conduct *both* influenced KPMG's decisions on legal fees. Indeed, it did not contest the point at the fee hearing.

3. *There Was Ample Evidence that KPMG Would Have Paid the Fees of Most of these Defendants Absent Government Interference*

Finally, the government contends that the Court's "key finding—that KPMG would have paid the defendants[ ]' legal fees absent the Thompson Memorandum and the conduct of the USAO—is wholly belied by the evidence of record." [60] It suggests that the Court erred in inferring

that KPMG would have paid its employees' defense costs here because KPMG had paid post-indictment defense costs in only one prior case and because the government has hypothesized other reasons why a firm in KPMG's position might have declined to pay.[61] But the government stipulated that KPMG had a long standing practice of paying the legal fees of its personnel "in any civil, criminal or regulatory proceeding involving activities arising within the scope of the individual's duties and responsibilities as a KPMG partner, principal, or employee." [62] It conceded that KPMG's legal fee decision was influenced by the Thompson Memorandum.[63] And there was considerably more evidence at the fee hearing than the bare words of the stipulation and the government's concession.

The government ignores the fact that KPMG, as of January 27, 2004—less than a month before the February 25 meeting, entered into an express contract with defendant Stein in which it agreed to pay his defense costs in "*all* legal proceedings or actions ... brought against [Stein] arising from and within the scope of his duties and responsibilities ..."—in other words, to adhere to its prior practice.[64] It ignores the fact that KPMG lawyers told the government at the February 25, 2004 meeting that no decisions had been made concerning payment of legal fees. It ignores their inquiry as to the government's view and distorts their tentative suggestion of a policy to avoid dealing with the fact that these were parts of an effort to see how far

*KPMG's determination(s) with respect to the advancement of legal fees and other defense costs to present or former partners and employees with respect to the investigation and prosecution of this case and such subsidiary issues as relate thereto."* Order, Apr. 13, 2006 [dkt. item 436] 2 (emphasis added).

59. Letter, Charles A. Stillman, May 5, 2006 [dkt. item 985] 3 (emphasis added).

60. Govt. App. Br. 42.

61. *Id.* at 63–66.

62. *Stein I*, 435 F.Supp.2d at 340.

63. Tr., May 10, 2006, at 399:16–19.

64. DX 6, ¶ 13 [SA6–7] (emphasis added).

KPMG could go in adhering to its prior practice and its agreement with Stein without risk to the firm. It ignores the fact that KPMG's lawyers told the government on February 25, 2004 that KPMG's "common practice" was to pay such fees—a statement that suggests that KPMG wished to, or at least was entertaining the possibility that it might, pay all employee defense costs in this matter. It ignores Mr. Bennett's statement that departing from its common practice of paying these expenses "would be a big problem" for KPMG because the firm was a partnership.[65] It ignores the fact that KPMG, in addition to paying post-indictment defense costs in a case years ago, much more recently had paid over $20 million in individual defense costs in the Xerox matter, which included a criminal investigation.[66] And it ignores Mr. Loonan's testimony, which strongly suggested that cost was not a factor in KPMG's decision here.[67] In short, the government ignores extensive evidence showing that KPMG was a partnership that historically had stood—and

hoped in this case to stand—behind its partners and employees, regardless of cost and regardless of whether the exposure they faced was criminal or civil, because the nature of the firm made it "a big problem" to do anything else. And it ignores as well something else that is telling.

In a little-noticed comment at the fee hearing, KPMG's general counsel mentioned that KPMG was paying the defense costs of many of the individuals indicted in this case in civil cases relating to these tax shelters.[68] The circumstances and full extent of its actions, however, became clear only in response to a recent question by the Court.

It now is undisputed that KPMG has been paying the defense costs of at least eleven of the sixteen KPMG Defendants[69] in civil cases relating to the tax shelters here at issue and also the defense costs of eight of them in regulatory inquiries relating to the conduct in question in this case.[70] The precise amount of these payments to date is not of record, but it

65. U30 [A1146].

66. Tr., May 8, 2006 (Loonan) 129:23–130:18.

67. Mr. Loonan testified that he was present at meetings at which the change in KPMG's practice was discussed, that no one at those meetings ever expressed the view that the firm should not spend the money required to pay individuals' defense costs, and that the decision-makers' explanation of the change in policy was based on undisclosed legal advice as to which Mr. Loonan invoked attorney-client privilege. Tr., May 8, 2006 (Loonan) 137:20–143:3. Thus, Mr. Loonan essentially ruled out cost as a factor and, though clearly limited by privilege considerations in the degree of detail he gave, left the unmistakable impression that KPMG made the decision based on purely legal, not economic or other business, considerations.

KPMG's ability to pay is not in question for several reasons. First, the fee hearing specifically focused on whether KPMG would have paid these defendants' legal fees, yet the government offered no evidence of any

inability on the part of KPMG to pay. Second, as noted, KPMG's Mr. Loonan testified in substance that cost was not a factor in the decision to refuse payment. Third, KPMG reported combined revenue of $16.9 billion, of which almost $6 billion was derived from the Americas, in fiscal year 2006. KPMG International Annual Review 2006 57 (2006), *available at* http://www.kpmg.com/NR/rdonlyres/80866830–14B9–4C72–B174–8B5A653D7E1C/0/ KPMGIAR 2006v11.pdf (last visited July 13, 2007).

68. Tr., May 9, 2006 (Loonan) 216:19–22, *see also* Tr., July 2, 2007, at 24:11–25:22.

69. The exceptions are Messrs. Greenberg, Larson, Pfaff, Rosenthal and Smith. Smith has submitted documents indicating that KPMG paid his fees also. Smith Decl. [dkt. item 1103] ¶¶ 5–8 & Ex. B.

70. Letter, John M. Hillebrecht, July 9, 2007 [dkt. item 1128]; *see also* Spears Decl. [dkt. item 1100] Ex. A.

exceeds $3.4 million.[71] Moreover, it is striking that KPMG has paid these costs subject to the requirement that the individuals be represented in the civil matters by attorneys who are not involved in defending this criminal case.[72]

The fact that KPMG is paying civil defense costs, regardless of amount, is consistent with its uniform practice over many years. What makes the criminal case different is only the Thompson Memorandum and the USAO's actions. Indeed, the fact that KPMG has been paying the civil defense costs on condition that the defendants' lawyers in those matters be different than their lawyers in the criminal case—a condition that is at war with any consideration of economy or efficiency—demonstrates with astonishing clarity that the different treatment of the criminal case defense costs has been driven from the outset by the fear that the government would view any assistance in defending against the indictment as a black mark against KPMG. KPMG cut off payment of defense costs to anyone who was indicted for one reason and one reason alone—the Thompson Memorandum and the related actions of the USAO. In their absence, KPMG would have paid every penny, just as it always had done before.

### 4. New Evidence that KPMG Would Have Paid Absent Government Interference

Three additional pieces of evidence—one of which was discovered only recently in the more than 22 million pages of discovery turned over to the defense, a second that was not previously of record, and the third only recently produced to the defense by KPMG—confirm the Court's finding that the Thompson Memorandum and the USAO's actions caused KPMG to change its policy, for this case only, with respect to payment of legal fees.

The first is a voicemail message on February 18, 2004—immediately after KPMG learned of the criminal referral but before the February 25 meeting with the USAO—from Gene O'Kelly, then KPMG's chief executive officer, to all partners.[73] It announced that the firm just had learned that the USAO would be commencing an investigation. It went on to say that "[a]ny present or former members of the firm asked to appear will be represented by competent council [sic] *at the firm's expense.*" There was no mention of conditioning KPMG's payment on cooperation, no mention of any cap on legal expenses, and no mention that the firm would stop paying in the event of indictment. The voicemail concluded by stating:

> "Finally, you should expect that I and other members of leadership will work diligently to bring this matter to a successful conclusion, *provide you with all the necessary support* and keep you updated on a periodic basis. *In closing, I ask that you exhibit the resolve that you've shown throughout the Xerox investigation which defines what makes us a great firm.*"[74]

---

71. Spears Decl. [dkt. item 1100] ¶ 6 & Ex. B.

72. Arkin Decl. [dkt. item 1088] ¶¶ 2–6 & Exs. B, C; DeLap Decl. [dkt. item 1118] ¶ 12; Letter, Diana D. Parker, July 10, 2007 [dkt. item 1131]; Gremminger Decl. [dkt. item 1083] ¶¶ 2–3; Lanning Decl. [dkt. item 1119] ¶ 3; Ritchie Decl. [dkt. item 1097] ¶¶ 2–3; Rule Decl. [dkt. item 1104] ¶¶ 5–6; Smith Decl. [dkt. item 1103] ¶ 5 & Ex. A; Watson Decl. [dkt. item 1099] ¶¶ 11–16.

73. A transcript of this voicemail was produced some time ago amidst the more than 22 million documents turned over in discovery. Defendants only recently found it. Defs. Mem. [dkt. item 1010] 7 n. 14; Govt. Mem. [dkt. item 1051] 14 n. 3.

74. Spears Decl. [dkt. item 1025] Ex. C (emphasis added).

The Xerox investigation, it will be recalled, was the criminal and SEC investigation in which KPMG spent over $20 million on the individual defenses of four of its personnel.

The second relates to the contract that KPMG negotiated with Richard Smith prior to February 25 and then refused to sign. The fact of the agreement and KPMG's refusal to sign were known previously. The Court did not know previously that the Smith contract contained a clause, substantively identical to that in the Stein contract,[75] that explicitly would have required KPMG to pay Smith's defense costs. Nor did the Court know previously that Smith and KPMG chairman O'Kelly had scheduled a meeting for February 27, 2004 to execute it. Following the February 25 meeting between KPMG and the USAO, however, KPMG refused to sign the contract to which it had agreed.[76]

The reason for KPMG's sudden change of heart is made clear by the final piece of new evidence—recently produced notes taken by Greg Russo, a senior KPMG executive, at the meeting at which the Skadden lawyers reported back to KPMG on their February 25 meeting with the USAO.[77] Near the beginning of the notes, Russo wrote:

"—Paying legal fees }
                     } not a sign
"—Severance          } of cooperation"[78]

After noting the nature of the possible charge against KPMG—"[c]onspiracy to defraud the U.S. Treasury"—the notes go on:

"(1) uphill battle—Neiman          } potential
                                    } action
"(2) no one has a get out of jail  } against
    free card—Weddle               } the firm
                                    }
"(3) shams—Sullivan                }"

Near the end, the notes state:

"→Attorneys fees for individuals as long as they cooperate, up to indictment w/ a cap

"→Severance a problem (Smith's pending agreement)"[79]

These three items of evidence sharpen the picture that emerged at the fee hearing. Mr. O'Kelly's voicemail supports the Court's finding that KPMG went into the February 25, 2004 meeting wishing to pay the defense costs of its personnel (not doing so "would be a big problem"), but apprehensive in light of the Thompson Memorandum that doing so would increase the risk that the firm would be indicted. So too does the fact that KPMG, only days before the February 25 meeting, reached an agreement with Mr. Smith on a contract that explicitly would have obligated the firm to pay his legal fees. It therefore is not surprising that Mr. Bennett on February 25 parried the prosecutors' inquiry about payment of legal fees and attempted to elicit the government's view. He did so in order to see whether KPMG could adhere to its usual practice, or something approaching it, without increasing the risk of indictment of the firm. The Russo notes, however, confirm that Skadden Arps reported back to KPMG after the meeting that the government was "angry," that Ms. Neiman had led Skadden to believe that avoiding an indictment of the firm would be an "uphill battle," that Mr.

---

75. *Compare* Smith Aff. [dkt. item 1017], Ex. C ¶ 8, *with* DX 6, ¶ 13 [SA6–7].

76. Smith Aff. [dkt. item 1017] ¶¶ 1–14.

77. These notes were not available at the fee hearing because KPMG declined to produce them pursuant to subpoena on privilege grounds. They first were produced by KPMG on May 17, 2007. Spears Decl. [dkt. item 1025] ¶ 5.

78. Spears Decl. [dkt. item 1025] ¶ 5 & Ex. D.

79. *Id.*

Weddle had stressed that "no one has a get out of jail free card," and that paying legal fees and entering into severance agreements would "not [be] a sign of cooperation." In other words, payment of legal fees and entering into severance agreements would increase the chance that KPMG would be indicted. It was only after that report that KPMG decided to (1) pay pre-indictment expenses up to $400,000 only for employees who cooperated with the government and waived the Fifth Amendment, (2) cut off legal expense payments to anyone who was indicted, and (3) make an abrupt about face and refuse to sign the Smith contract that it had agreed to only days earlier.

KPMG would have paid the legal expenses of thirteen of the defendants (and signed Smith's contract) had the government not interfered both by the Thompson Memorandum and the actions of the USAO. As will appear below, however, the Court, upon consideration of matters not previously focused upon by the parties, is not so persuaded as to three defendants.

### III. The Due Process Arguments [80]

Both sides discuss whether the government's conduct in this case shocks the conscience, a term that carries special significance in the context of substantive due process analysis. The KPMG Defendants urge that the government's inducement of KPMG's cut off of defense costs was part of a broader pattern of government misconduct that shocks the conscience and violated their right to substantive due process. They argue that this constitutes a separate constitutional violation, independent of those found in *Stein I*.[81] They contend further that a finding that the government's actions shock the conscience would make deterrence of future misconduct a pertinent consideration in determining the remedy and independently warrant dismissal.[82]

The government concedes that a finding that its actions shock the conscience is not an element of a substantive due process violation in the circumstances of this case—i.e., where there is no adequate remedy short of dismissal.[83] In consequence, it urges the Court not to consider defendants' argument.[84] But it is reasonably plain that the government's concession with respect to dismissal, whether so motivated or not, is a prelude to an appeal. It therefore is appropriate for the Court to

---

**80.** In *Stein I*, the Court found violations of the KPMG Defendants' Sixth Amendment and substantive due process rights. Although the parties have not raised this issue, the Court is well aware that where an Amendment "provides an explicit textual source of constitutional protection ... that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing [the] claims." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Pabon v. Wright,* 459 F.3d 241, 253 (2d Cir.2006). The finding of substantive due process violations in *Stein I* constitutes an alternative holding that would be material in the event that a reviewing court disagreed with the Court's Sixth Amendment analysis.

**81.** *E.g.,* Tr., July 2, 2007, at 8:2–16, 8:23–9:7.

**82.** *E.g., id.* at 16:18–17:6.

**83.** *E.g., id.* at 85:12–90:6.

> As will appear, the Court agrees with the government's conclusion that a finding that its actions shock the conscience is not indispensable here. It finds the government's rationale for its position, however, illogical, as it appears to confuse the question whether there was a constitutional violation with the availability of particular remedies.

**84.** Govt. Mem. [dkt. item 1051] 11 ("[G]iven that the Court has already held that the Government has violated the Fifth and Sixth Amendment rights of the defendants, and given that neither the Government nor the defense has been able to suggest a remedy that addresses the violation as defined by the Court, we respectfully submit that the Court need not consider the defendants' arguments as to outrageous misconduct.")

consider the defendants' argument because it may prove significant to a reviewing court.

## A. The KPMG Defendants' Pattern Argument

The KPMG Defendants argue that the government not only coerced KPMG into cutting off payment of legal fees, but improperly coerced some of them to make statements to prosecutors, coerced KPMG into admitting to an unduly one-sided Statement of Facts as part of the deferred prosecution agreement, improperly joined nineteen defendants in a single indictment and resisted any severance for the purpose of coercing guilty pleas by the threat of an unmanageable and costly trial, and dissembled to the Court in the fee proceedings.[85]

The Court already has ruled on certain elements of this argument. In its decision on certain defendants' motions to suppress, the Court found that the government improperly used its leverage over KPMG to induce KPMG to coerce proffers by certain defendants.[86] It found previously that the USAO was "economical with the truth" in its effort to avoid an evidentiary hearing on the defendants' motion with respect to the fee issues.[87] From a factual perspective, nothing else need be said on these points.

The argument concerning the Statement of Facts is, at least in part, a recycling of an argument previously rejected.[88] In summary, it boils down to the contention that the government largely dictated the terms of the Statement of Facts to which KPMG was forced to assent in order to avoid indictment, while at the same time forbidding KPMG from conducting an internal investigation to determine exactly what had transpired. The government, the argument goes, did so, at least in some degree, because it wanted to use the extensive admissions of wrongdoing that it demanded against "taxpayers and other professional service providers, such as E & Y [Ernst & Young], Sidley [Austin LLP and] Deutsche Bank."[89] But this would add little if anything to the KPMG Defendants' position, even if it were entirely accurate, a point the Court need not reach. For even if the government's actions vis-a-vis the Statement of Facts were reprehensible, they would not have affected these defendants.

The argument concerning the government's tactics with respect to joinder and severance has substance to the extent that it now seems that the government never expected or intended to try together anything approaching the nineteen defendants named in the indictment.[90] It mistakenly

**85.** Defs. Mem. [dkt. item 1010] 7–23.

The KPMG Defendants, on the basis of documents that only recently have come to light, maintain also that the Internal Revenue Service and the Department of Justice engaged in improper and possibly criminal misconduct by disclosing and receiving, respectively, tax return information in violation of 26 U.S.C. § 6103. *See* Smith Reply [dkt. item 1075] 4–15. As this contention first was raised in their reply papers, the Court is treating that contention as a separate motion and has established a separate briefing schedule.

**86.** *See Stein II,* 440 F.Supp.2d 315. The Court concluded that the government was guilty of improper pressure with respect to all nine moving defendants. It denied suppression as to seven, however, on the ground that those defendants had failed to establish that they would not have proffered without regard to the pressure exerted by KPMG at the government's instigation. *Id.* at 326–30, 333.

**87.** *Stein I,* 435 F.Supp.2d at 381.

**88.** *United States v. Stein,* No. S1 05 Crim. 0888(LAK), 2006 WL 1063295 (S.D.N.Y. Apr. 5, 2006).

**89.** Spears Decl. [dkt. item 1025] Ex. N, at 4.

**90.** Tr., Oct. 3, 2006, 43:15–44:10, 48:8–12; Govt. Mem. [dkt. item 745] 1–2.

expected a substantial number of guilty pleas. Nevertheless, the government until very recently stoutly resisted any severance, a course that, as defendants argue, may have increased the pressure on them to enter guilty pleas. Defendants therefore impute to the government a motive to coerce guilty pleas. But this argument is readily answered.

While the return of indictments with so many defendants is not favored,[91] it is not forbidden. Common experience, moreover, teaches that the vast majority of criminal defendants plead guilty regardless of the number of individuals included in the instruments in which they are charged. On the face of it, the government's joinder of these nineteen defendants and its opposition to severance, which always were subject to the Court's power to grant a severance if that were warranted, cannot be faulted. In the absence of evidence that the joinder and the government's litigation posture were specifically intended to pressure individuals to enter guilty pleas, the Court finds no impropriety notwithstanding that the government's tactics perhaps were ill-advised.

In the last analysis, then, the KPMG Defendants' contention that the government has engaged in a conscience-shocking pattern of misconduct stands or falls on the findings that the Court made in *Stein I* and *Stein II*: that the government improperly coerced KPMG into refusing to pay the KPMG Defendants' defense costs, was less than candid with the Court in its effort to avoid a hearing on that issue, and improperly used KPMG to coerce proffers from KPMG personnel.

### B. The Legal Standard

The substantive component of the Due Process Clause protects the individual against "the [government's] exercise of power without any reasonable justification in the service of a legitimate governmental objective."[92] In *County of Sacramento v. Lewis*, the Supreme Court held that "criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue."[93] Where the challenged government action is legislation, the question is whether a fundamental liberty interest was infringed and, if so, whether the legislation survives strict scrutiny. Where, however, the challenged government action is the conduct of a particular government employee or official, *County of Sacramento* held that the question is whether the conduct "shocks the conscience."[94]

It is not clear that the Supreme Court still adheres to the *County of Sacramento* framework.[95] The Second Circuit has

---

91. *See United States v. Casamento,* 887 F.2d 1141, 1151–52 (2d Cir.1989).

92. *County of Sacramento v. Lewis,* 523 U.S. 833, 845–46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

93. *Id.* at 846, 118 S.Ct. 1708.

94. *Id.* at 846–47, 118 S.Ct. 1708.

95. In *Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003), the plaintiff brought a § 1983 suit against a police officer for coercive interrogation methods. Although a majority of the Court did not reach the merits of plaintiff's substantive due process claim, Justice Thomas, in an opinion

joined by the Chief Justice and Justice Scalia, analyzed the claim under both the "shocks the conscience" test and the fundamental liberty interest test. *Id.* at 774–76, 123 S.Ct. 1994. Justice Stevens, in a separate opinion, also identified the two tests as alternative means for analyzing a substantive due process claim and noted that "unusually coercive police interrogation procedures" had been found often to violate the second standard. *Id.* at 787, 123 S.Ct. 1994. Finally, Justice Kennedy, in an opinion joined by Justices Stevens and Ginsburg, stated that "use of torture or its equivalent in an attempt to induce a statement violates an individual's fundamental right to liberty of the person." *Id.* at 796, 123 S.Ct. 1994; *see also Conn v.*

done so in some cases and, it appears, departed from it in others.[96] Given the uncertainty, it is appropriate to consider the substantive due process question under the *County of Sacramento* rubric notwithstanding the parties' agreement that a finding that the government's · actions shock the conscience is not essential to the conclusion that the government violated the defendants' rights to substantive due process.

*Stein I* discussed two closely related matters: the Thompson Memorandum itself and the actions of the USAO. The Thompson Memorandum in substance was a regulation.[97] The Second Circuit has held that regulations fall into the legislative category.[98] In consequence, a substantive due process challenge to the Thompson Memorandum properly is analyzed first by determining whether it impinged upon a fundamental right and, if it did, by then considering whether it was narrowly tailored to serve a compelling governmental interest. *Stein I* employed exactly this analysis and thus conformed precisely to *County of Sacramento* and its Second Circuit progeny.[99] It is unnecessary to consider whether the Thompson Memorandum shocked the conscience.

*Stein I* concluded also that individual AUSAs unjustifiably acted in a manner that improperly impinged on the KPMG Defendants' right to fairness in the criminal process.[100] Given the relationship between their actions and the Thompson Memorandum,[101] the Court sees their conduct as more analogous to regulatory action than to the action of an individual officer reacting to an unanticipated situation. In consequence, the analysis in *Stein I* is sufficient to conclude that their actions were part and parcel of the deprivation of the KPMG Defendants' rights to substantive due process that was inherent in the Thompson Memorandum. Nevertheless, the Court recognizes that this perhaps is unfamiliar ground and that a determination whether their actions independently shock the conscience in the constitutional sense may prove significant for one or more purposes.

## C. The Actions of the USAO "Shock the Conscience"

The "shocks the conscience" standard, sometimes referred to as the "outrageous

---

*Gabbert,* 526 U.S. 286, 291–92, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (analyzing substantive due process claim against prosecutors' conduct without reference to "shocks the conscience" test).

**96.** *Compare Pabon v. Wright,* 459 F.3d at 250–51; *O'Connor v. Pierson,* 426 F.3d 187, 202–03 (2d Cir.2005), *with Poe v. Leonard,* 282 F.3d 123, 137–39 (2d Cir.2002) (finding substantive due process violation for police officer conduct sufficiently alleged where officer's conduct infringed fundamental right to privacy and, "independently," because officer's conduct shocked the conscience); *Kia P. v. McIntyre,* 235 F.3d 749 (2d Cir.2000) (analyzing substantive due process claim against social worker's action without reference to "shocks the conscience" test).

**97.** It was a Justice Department policy binding on United States Attorneys. *Stein I,* 435 F.Supp.2d at 338.

**98.** *Leebaert v. Harrington,* 332 F.3d 134, 140 & n. 2 (2d Cir.2003) (applying the fundamental right standard to a regulation, noting "[w]e read *Sacramento* to apply broadly to governmental regulation and not to be limited to legislation") (citing *Immediato v. Rye Neck School Dist.,* 73 F.3d 454, 460–61 (2d Cir. 1996)).

**99.** *See Stein I,* 435 F.Supp.2d at 362–65 & n. 170.

**100.** *Id.* at 365.

**101.** *See id.* at 365 ("The individual prosecutors in the USAO acted pursuant to the established policy of the DOJ as expressed in the Thompson Memorandum.").

government conduct" standard, is "necessarily imprecise."[102] Justice Scalia has criticized it as being the *"ne plus ultra . . . of subjectivity."*[103] Nevertheless, it remains a part of our constitutional jurisprudence.

■ At the extremes, the test is comparatively easy of application. "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process" while "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."[104] The closer questions occur between these extremes—where government officials act neither for the purpose of inflicting injury nor negligently.

In this case, the USAO pressured KPMG to withhold payment of legal fees. As *Stein I* found, the prosecutors understood "that the threat inherent in the Thompson Memorandum, coupled with their own reinforcement of that threat, was likely to produce exactly the result

that occurred—KPMG's determination to cut off the payment of legal fees for any employees or former employees who were indicted and to limit and condition their payment during the investigative stage."[105]

The actions of the prosecutors with respect to legal fees may be considered also in light of their actions with respect to obtaining proffers from KPMG employees under suspicion, all of whom had a Fifth Amendment right to decline to speak to the government. The prosecutors knew that the Thompson Memorandum effectively compelled KPMG to make its personnel available for interviews by the government. They knew, as the government said at the fee hearing, that "there are two ways the company could get their people in. One is they could hold over their head their job. The other is they could cut off their legal fees." They therefore understood that KPMG would threaten to fire or cut off payment of legal fees for employees and former employees whom prosecutors reported were not cooperating—i.e., who were refusing to submit to interviews with the government.[106] Yet the prosecutors

---

**102.** *O'Connor v. Pierson,* 426 F.3d 187, 203 (2d Cir.2005).

**103.** *County of Sacramento,* 523 U.S. at 861, 118 S.Ct. 1708 (Scalia, J., concurring in judgment).

**104.** *Id.* at 849, 118 S.Ct. 1708.

**105.** 435 F.Supp.2d at 365.

**106.** In summing up following the fee hearing, government counsel said:

"I don't think anybody is disputing that the Thompson memo as a whole had an influence on their decisions with respect to the legal fees. They have couched it in reference to, the reference to legal fees in the Thompson memo versus under the Thompson memo, or any guidelines frankly, whether the Thompson memo was there or not, if a company wants to attempt to cooperate as opposed to be charged, one of the things they needed to do is get their people in to give the information. The company can't talk, only the people can talk.

"Whether or not the Thompson memo made reference to legal fees, *there are two ways the company could get their people in. One is they could hold over their head their job. The other is they could cut off their legal fees. If it's a former employee, the first one isn't even relevant. So regardless of whether there is a reference in the Thompson memo for legal fees, that is all the company can do to get its people in."* Tr., May 10, 2006, at 399:17–400:8 (emphasis added). What the government admitted with respect to the Thompson Memorandum applies equally to the actions of the AUSAs in (1) telling KPMG, with respect to payment of legal fees, that misconduct should not be rewarded and that any such action would be looked at "under a microscope" and (2) reporting to KPMG the identities of KPMG employees who declined to make statements to prosecutors or whose responses to such "requests" did not meet with prosecutors' approval.

identified such persons to KPMG anyway. These actions are significant not only in themselves, but also for the insight they provide into the prosecutors' actions with respect to payment of legal fees. For they demonstrate a willingness by the prosecutors to use their life and death power over KPMG to induce KPMG to coerce its personnel to bend to the government's wishes notwithstanding the fact that the Constitution barred the government from doing directly what it forced KPMG to do for it.

■ Just as prosecutors used KPMG to coerce interviews with KPMG personnel that the government could not coerce directly, they used KPMG to strip any of its employees who were indicted of means of defending themselves that KPMG otherwise would have provided to them. Their actions were not justified by any legitimate governmental interest. Their deliberate interference with the defendants' rights was outrageous and shocking in the constitutional sense because it was fundamentally at odds with two of our most basic constitutional values—the right to counsel and the right to fair criminal proceedings. But the Court does not rest on this finding alone. It would reach the same conclusion even if the conduct reflected only deliberate indifference to the defendants' constitutional rights as opposed to an unjustified intention to injure them.

The question whether deliberately indifferent government conduct is outrageous or shocking depends on the circumstances.[107] In a high-speed police chase, for example, an officer has but a moment to decide how to respond. In that context, an officer's conduct "shocks the conscience" only if there is an actual intent to cause harm, principally because there is no time for sober reflection on the possible consequences of the officer's actions.[108] To take another example, a governmental actor's thoughtful choice between equally compelling competing obligations is unlikely to be shocking. "In the apparent absence of harmless options at the time decisions must be made, an attempt to choose the least of evils is not itself shocking."[109]

Conversely, where a government agent has "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations," deliberate indifference to a person's rights can be shocking.[110] As the Second Circuit has noted, *"County of Sacramento* strongly suggests that in those circumstances when actual deliberation is possible, a showing of deliberate indifference will establish Fourteenth Amendment liability."[111]

In this case, the AUSAs had ample time for deliberation and in fact deliberated before acting. They met privately before the February 25, 2004 meeting with KPMG and decided to inquire as to whether KPMG intended to pay legal fees of its personnel. It is entirely likely, and the Court finds, that they then decided the substance of their intended reaction to KPMG's possible responses. Nevertheless, they made clear that any discretionary payment of legal fees by KPMG would be looked at "under a microscope" and responded to a comment concerning payment of legal fees by emphasizing that misconduct should not be rewarded— threats if ever there were any.

**107.** *County of Sacramento,* 523 U.S. at 850, 118 S.Ct. 1708 ("Deliberate indifference that shocks in one environment may not be so patently egregious in another.").

**108.** *Id.* at 853–54, 118 S.Ct. 1708.

**109.** *Lombardi v. Whitman,* 485 F.3d 73, 82 (2d Cir.2007).

**110.** *County of Sacramento,* 523 U.S. at 853, 118 S.Ct. 1708.

**111.** *Pabon v. Wright,* 459 F.3d at 251.

In any case, KPMG made clear when it left the meeting that it had made no decisions concerning legal fees and did not get back to the government even with its preliminary view until March. The AUSAs therefore had even more time—time in which to reflect upon what had transpired at the meeting and to make the USAO's views entirely clear if any ambiguity or misimpression had been left at the meeting. They easily could have called KPMG and said, for example, that payment of legal fees would not affect the USAO's view of whether to indict KPMG unless it became clear that it was part of a scheme to obstruct the investigation—the view they claim to have held of when consideration of payment of legal fees would have been appropriate in deciding when to indict a business entity. But they did not. Nor did they tell KPMG in March, when its lawyers called to convey the firm's decision on payment of legal fees, that KPMG had gone further than the government thought was necessary or appropriate. They did not do so because they did not want KPMG to assist its employees. Indeed, AUSA Okula frankly admitted that he did not think KPMG should pay for attorneys for its personnel.[112]

The government's actions with respect to legal fees were at least deliberately indifferent to the rights of the defendants and others. In all the circumstances, this behavior shocks the conscience in the constitutional sense whether prosecutors were merely deliberately indifferent to the KPMG Defendants' rights or acted more culpably.

## IV. The Impact on the KPMG Defendants

### A. Deprivation of Counsel of Choice

It now is clear, and the Court finds, that four defendants have been deprived of counsel of their choice, quite apart from any other consequences of the government's actions.

As an initial matter, the government does not dispute that defendants Hasting and Watson engaged counsel prior to indictment, wished to be defended by those attorneys after indictment, but were forced to terminate these attorneys following or on the eve of indictment because KPMG cut off payment of their legal fees and these defendants could not otherwise afford them.[113]

Mr. Gremminger's position is virtually identical. While he still was employed by KPMG, he hired the Jones Day firm. KPMG paid the fees until Mr. Gremminger was told by the USAO that he had become a target of the investigation, at which point KPMG fired him effective immediately and reneged on a previous promise to pay the severance package to which he was entitled as a KPMG partner,[114] just as KPMG had reneged on Mr. Stein's contract and refused to sign the contract that it had agreed upon with Mr. Smith. At that point, Jones Day "was far too expensive" for Mr. Gremminger, so he replaced it with his present counsel (at approximately half the hourly rate).[115]

Mr. Ritchie is in a comparable but slightly different position. In 2004, he retained Cadwalader Wickersham & Taft ("CWT") to defend him in the government's investigation.[116] Once the indict-

---

112. "Q. So as you went into the meeting, it was your view that if they had discretion, they shouldn't pay the fees to the subjects. Is that right? A. My personal view? Yes." Tr., May 8, 2006 (Okula) 69:1–4.

113. Hasting Am. Decl. [dkt. item 1046] at 2; Watson Decl. [dkt. item 1009] ¶¶ 2–12.

114. Gremminger Decl. [dkt. item 1110] ¶¶ 3–4, 7.

115. Id. ¶ 7.

116. Ritchie 2d Supp. Decl. [dkt. item 1113] ¶ 5.

ment was returned, he wished to continue the services of CWT through trial.[117] He hired also Arguedas, Cassman & Headley, a much smaller firm, as co-counsel.[118] KPMG's refusal to pay his defense costs, however, left him with insufficient resources to pay both firms despite the fact than another employer is advancing half of his legal expenses. Accordingly, he terminated CWT.[119] He now is represented only by the Arguedas firm and a solo practitioner.

Mr. Greenberg makes a similar claim. He initially was represented by Arent Fox LLP and after indictment retained also the New York office of Goodwin Procter as well as a trial attorney from Denver, Pamela Mackey. He ultimately decided in light of the expense, he says, to terminate both Arent Fox and Ms. Mackey and avers that he would not have done so if KPMG had been funding his defense.[120]

Mr. Greenberg resigned from KPMG in February 2003, effective August 31, 2003, and gave KPMG a release.[121] While he requested in 2004, after retaining Arent Fox, that KPMG pay his legal fees, KPMG immediately refused.[122] He first retained Ms. Mackey after he was indicted in 2005.[123] He terminated Arent Fox as counsel on or about February 13, 2006,[124]

more than four months after he was indicted and after Arent Fox lost a motion to release Mr. Greenberg on bail.[125] Thus, Mr. Greenberg first hired Ms. Mackey after he knew that KPMG would not pay his fees and continued the services of Arent Fox for more than a year after KPMG made its intentions toward him plain. Moreover, the termination of Arent Fox may well have been a product of its loss of the bail application. In all the circumstances, the Court is not persuaded that Mr. Greenberg was deprived of counsel of his choice by the government's actions.[126]

### B. The Other Practical Consequences

None of the other KPMG Defendants claims to have been deprived of counsel of his or her choice. That is not to say, however, that the government's actions have not impacted the ability of any of them to defend themselves. In order to appreciate that impact, it first is necessary to understand the exceptional demands that this case places on the defendants.

### 1. The Scope and Nature of this Case
### (a) Discovery

The volume of documents produced by the government in this case is enormous.

---

117. *Id.* ¶ 10.

118. *Id.* ¶ 12.

119. *Id.* ¶¶ 13–15.

120. Greenberg Decl. [dkt. item 1120] ¶ 16.

121. Pitofsky Decl. [dkt. item 763] Ex. B, ¶¶ 1, 8

122. Letter, Margaret Garnett, June 26, 2007 [dkt. item 1123].

123. Greenberg Decl. [dkt. item 1120] ¶ 16.

124. Price Decl. [dkt. item 359] ¶ 10.

125. *United States v. Stein,* No. S1 05 Crim. 0888(LAK), 2005 WL 3071272 (S.D.N.Y. Nov. 15, 2005).

Mr. Greenberg was released on bail pursuant to a subsequent application. The reply memorandum in support of his motion [dkt. item 344] was not signed by Arent Fox.

126. Mr. Stein also claims that he was deprived of his counsel of choice, asserting that KPMG's repudiation of his contract was among the factors that led him to decide to replace the lead counsel he initially chose with his present attorney. Stein Decl. [dkt. item 1121] ¶ 12(e). In view of the equivocal nature of the assertion and the Court's conclusion that the indictment should be dismissed as to Mr. Stein for another reason, it is unnecessary to determine this point.

By November 11, 2006, it had turned over more than 22 million pages of material either in electronic or tangible form,[127] and production has continued through recent months.[128] This volume is large even when compared to other complex, white collar prosecutions.[129] Moreover, the discovery continues. Despite an October 2005 discovery deadline, over 1 million pages have been produced since June 1, 2007,[130] and it appears that the end has not been reached.[131]

To be sure, a good deal of this material has been produced in the form of digital files produced by optical scanning of physical documents. While this in theory might have been very helpful, three circumstances have lessened its utility.

First, the electronic production has been made in various formats and, to some extent, in the form of separate hard drives containing multiple databases. Defendants thus have been forced either to combine all of this material into a single data base to permit single searches of the entire electronic production or to conduct multiple identical searches in different databases.[132]

Second, the optical character recognition ("OCR") technology used to convert physical documents into electronic images has significant limitations. It does not recognize handwriting, and it often does not produce a usable electronic image if the physical source document is of poor quality, as for example in the case of a poor copy. While these problems can be remedied with human input, the process is time consuming and, on this scale, either extremely costly or impracticable.[133]

Third, there have been numerous technical problems with the electronic materials produced by the government. These have included incorrect descriptive information, inactive links to documents, multiple copies of single documents, and poor quality disks requiring additional labor to render them searchable.[134]

In addition, it bears noting that the documents produced in tangible form occupy hundreds of boxes that are available only in a warehouse or by purchasing copies at great expense.[135]

The Court recognizes that the government recently and commendably agreed to build, at its expense, a searchable electronic database containing many of the documents that have been produced in discovery for use by the defendants. Although this comes very late in the day and will be subject to substantial limitations, it doubtless will be of some help. But it will not come close to eliminating the difficulties of dealing with a case in which there are over 22 million documents. Nor does it address the facts that many defendants lack the resources to pay their counsel to review many of the documents and that it will not

---

**127.** Lefcourt Aff. [dkt. item 821] ¶¶ 4–5 (15 million pages produced by June 20, 2006 and more than 7 million additional pages produced by November 11, 2006).

**128.** Madigan Decl. [dkt. item 1007] ¶ 5.

**129.** *See* Defs. Mem. [dkt. item 1010] 26 n. 32.

**130.** Letter, George D. Niespolo, July 6, 2007 [dkt. item 1133]; *see also* Glavin Decl. [dkt. item 1051] ¶¶ 2–3.

**131.** Tr., Dec. 20, 2006, at 6:6–24.

**132.** Lefcourt Aff. [dkt. item 821] ¶ 20; Anderson Decl. [dkt. item 561] ¶ 16; Guthrie Decl. [dkt. item 562] ¶¶ 7–9.

**133.** Anderson Decl. [dkt. item 561] ¶ 25; Guthrie Decl. [dkt. item 562] ¶ 16.

**134.** Lefcourt Aff. [dkt. item 821] ¶ 21; Anderson Decl. [dkt. item 561] ¶¶ 17–20; Ma Aff. [dkt. item 622] ¶ 5.

**135.** Rule Decl. [dkt. item 1018] ¶ 7; Anderson Decl. [dkt. item 561] ¶¶ 45–66.

address the need to access the paper documents.[136]

### (b) Motion Practice

The Court commented long ago that defendants in the opening stage of this case filed 26 motions supported by memoranda of law totaling approximately 1,100 pages.[137] Intensive motion practice has continued since then. The full scope is apparent from the docket sheet. An indication lies in the fact that Westlaw contains twenty-four decisions in this case.

### (c) Trial

As previously noted, the government has designated nearly 70 witnesses and 2,000 exhibits totaling more than 150,000 pages for its case in chief.[138] It estimates that presentation of its case-in-chief will take approximately four months. The anticipated overall length of the trial is between six and eight months.[139]

### (d) Subject Matter

Finally, it must be noted that the subject matter of the case presents unusual challenges. The nature of the tax shelter transactions, the transactional documents, and the tax law that is pertinent to the case all are extremely complex.[140] It is difficult to imagine an attorney whose expertise is trial practice properly defending this action without the active participation of a tax specialist steeped in the kinds of transactions at issue here. The need for trial counsel to understand this difficult material will greatly add to the cost of preparing for trial.

### 2. The Limitations on the Defense

All of the KPMG Defendants as to whom the government concedes dismissal to be the proper remedy say that KPMG's refusal to pay their post-indictment legal fees has caused them to restrict the activities of their counsel, limited or precluded their attorneys' review of the documents produced by the government in discovery, prevented them from interviewing witnesses, caused them to refrain from retaining expert witnesses, and/or left them without information technology assistance necessary for dealing with the mountains of electronic discovery.[141] The government has not contested these assertions. The Court therefore has no reason to doubt, and hence finds, that all of them

---

**136.** *See* Rule Decl. [dkt. item 1018] ¶ 9.

**137.** *United States v. Stein*, 424 F.Supp.2d 720, 723 (S.D.N.Y.2006).

**138.** Govt. Mem. [dkt. item 745] at 5; Kaley Decl. [dkt. item 1001] ¶ 4; Tr., Mar. 12, 2007, at 16:10–17.

The regular trial exhibits amount to approximately 36,000 pages. The government intends to offer an additional 126,000 pages as containing the data included in summary exhibits. Tr., Mar. 12, 2007, at 16:10–17; *see* Fed.R.Evid. 1006.

**139.** Tr., Jul. 13, 2006, at 134:3–4, 135:5–15.

**140.** A modest indication of the complexity of the tax shelters involved in this case is *Klamath Strategic Inv. Fund, LLC v. United States*, 472 F.Supp.2d 885 (E.D.Tex.2007), which involved only certain aspects of one of the types of transactions involved here and

did so only from the perspective of the taxpayer.

**141.** Niespolo Decl. (Bickham) [dkt. item 1003] ¶ 4 (adopting statements of counsel for DeLap); Wing Aff. (DeLap) [dkt. item 1011] ¶ 4; DeLap Decl. [dkt. item 1118] ¶¶ 15–17; Arkin Decl. (Eischeid) [dkt. item 1117] ¶¶ 13–18; Kaley Decl. (Gremminger) [dkt. item 1001] ¶¶ 6–7; Gioiella Decl. (Hasting) [dkt. item 1095] at 3–4; Madigan Decl. (Lanning) [dkt. item 1091] ¶ 17; Ritchie Decl. [dkt. item 1014] ¶ 3; Ritchie 2d Supp. Decl. [dkt. item 1113] ¶¶ 10, 15; Rosenthal Aff. [dkt. item 1116] ¶ 8; Rosenthal Aff. [dkt. item 1045] ¶ 8; Rule Decl. (Smith) [dkt. item 1018] ¶¶ 9–10, 12; Smith Decl. [dkt. item 1108] ¶¶ 15–16; Spears Decl. (Stein) [dkt. item 1071] ¶¶ 13–24; DeVita Decl. (Warley) [dkt. item 998] ¶ 5; Watson Decl. [dkt. item 1009] ¶¶ 21–26; DePetris Decl. (Wiesner) [dkt. item 1064] ¶¶ 6–7; Wiesner Decl. [dkt. item 1109] ¶ 5.

have been forced to limit their defenses in the respects claimed for economic reasons and that they would not have been so constrained if KPMG paid their expenses subject only to the usual sort of administrative requirements typically imposed by corporate law departments on outside counsel fees.[142]

## V. The Remedy

■ Dismissal of an indictment on the grounds of prosecutorial misconduct is an "extreme and drastic sanction"[143] that should not even be considered unless it is otherwise "impossible to restore a criminal defendant to the position that he would have occupied" but for the misconduct.[144] Moreover, "remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."[145] Notwithstanding the government's current position that the case should be dismissed as to thirteen defendants, the Court therefore is obliged to consider independently whether dismissal now is appropriate and, if so, whether that remedy is appropriate as to each defendant. It is necessary to deal first, however, with a preliminary matter.

## A. The Government's CJA Argument

The government's memorandum states that it "previously argued . . . [that], to the extent that a given defendant establishes that he has suffered actual prejudice, in that he or she lacks sufficient funds to adequately defend the case, the appropriate remedy is an application under the Criminal Justice Act ["CJA"]."[146] It nevertheless concedes that dismissal is the appropriate remedy with respect to thirteen of the KPMG Defendants, assuming that *Stein I* stands. These positions appear to be inconsistent. Although the government does not expressly seek to reconcile them, the implication seems to be that the Court previously rejected a government contention that appointment of counsel under the CJA would be the appropriate remedy for the constitutional violations and, given that rejection, that dismissal is the only remaining option.

The government is incorrect in suggesting that the Court has passed on this argument. What occurred was this. The KPMG Defendants argued, among other things, that the Court should order that the government pay defendants' legal fees out of the fines that KPMG paid and, at that time, still owed to the government pursuant to its deferred prosecution agreement. The government responded that the Court lacked statutory authority to do so and that the remedy that the defendants had suggested was not authorized by the CJA.[147] It did not argue that appointment of CJA counsel would be the appropriate remedy if the Court found

---

**142.** *See* Tr., May 8, 2006 (Loonan) 128:18–130:18.

**143.** *United States v. Rubio*, 709 F.2d 146, 152 (2d Cir.1983) (internal quotation marks omitted); *see also United States v. Morrison*, 449 U.S. 361, 365–66 & n. 3, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) (citing *United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966)); *United States v. Estrada*, 164 F.3d 619, 1998 WL 716074, at *2 (2d Cir.1998); *United States v. Fields*, 592 F.2d 638, 647–48 (2d Cir.1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979).

**144.** *United States v. Artuso*, 618 F.2d 192, 196–97 (2d Cir.) (quoting *United States v. Fields*, 592 F.2d at 647–48), *cert. denied*, 449 U.S. 879, 101 S.Ct. 226, 66 L.Ed.2d 102 (1980).

**145.** *United States v. Morrison*, 449 U.S. at 364, 101 S.Ct. 665.

**146.** Govt. Mem. [dkt. item 1051] 6 (citing Govt. Mem. [dkt. item 873] 6–7).

**147.** Govt. Supp. Mem. [dkt. item 459] 19–21.

constitutional violations, so the Court had no occasion to pass on that question.[148] Nevertheless, it will do so now.

We begin by focusing on the precise issue raised by this suggestion. The constitutional violation here was the government's improper interference with the payment of the KPMG Defendants' defense costs. The question therefore is whether the availability of CJA appointments for defendants who have or will become financially eligible would place those defendants in the position they would have been in had the government not interfered.

Had KPMG not changed its policy on payment of defense costs in response to the government's threats, the KPMG Defendants would have had their legal fees and related expenses paid by KPMG. The overall cost would not have been an issue.[149] Among other things, KPMG, as noted, not long ago paid over $20 million in defense costs for four partners involved in the Xerox matter.

There are important differences between the position the KPMG Defendants would have occupied had KPMG paid and the positions they now are in.

First, CJA funds may be expended only on behalf of financially eligible persons.[150] The Court's plan for the administration of the CJA makes eligibility turn on whether an applicant's "net financial resources and income are insufficient to enable the person to obtain qualified counsel," a determination to be made with regard to "the cost of providing the person and his or her dependents with the necessities of life." [151] While this does not require a showing of indigency,[152] the retention of assets in excess of those essential to provide "the necessities of life" would be disqualifying. Thus, a defendant who is not financially eligible at the outset of a criminal prosecution must spend down his or her assets in order to qualify under the CJA. A CJA appointment for any defendant who had material resources at the date of indictment therefore would not be the equivalent of what that defendant would have had absent the government's interference with KPMG.

Second, the CJA establishes a $7,000 maximum fee for the representation of felony defendants.[153] While the Chief Judge of the Court of Appeals or his designee may and, in more routine cases, generally does approve higher fees, upon certification by the district judge of their necessity, any such request must be justified.[154] Although this Court would certify that this case is extended and complex and the Circuit surely would agree, the large financial demands that this case could place on the funds available would create a risk that the activities of CJA-appointed counsel would be restricted.[155] Counsel aware of that

---

148. In response to a motion to withdraw by counsel for Mr. Hasting, the government asserted that the CJA would provide appropriate relief if Hasting could not afford to pay defense counsel. It did not, however, suggest that this was an appropriate remedy for the constitutional violation. *See* Govt. Mem. [dkt. item 873] 6–7.

149. *Supra* note 66.

150. 18 U.S.C. § 3006A(a).

151. United States District Court, Southern District of New York, *Revised Plan for Furnishing Representation Pursuant to the Criminal Justice Act* (effective Oct. 1, 2005) (the "Plan") § VI(A).

152. *E.g., United States v. Parker,* 439 F.3d 81, 96 (2d Cir.2006).

153. 18 U.S.C. § 3006A(d)(2).

154. Plan § IX(B).

155. The Court has been advised by the Administrative Office of United States Courts that this district's total expenditures for CJA counsel in recent years have been significantly lower than $20 million per year.

possibility might well limit their activities to avoid the risk of non-payment. This too would compare unfavorably with the defendant's situation if KPMG were paying the defense costs in accordance with its prior practice, as it would have done absent government interference.[156]

Thus, availability of CJA appointments to financially eligible defendants could not fully remedy the damage done by the government's actions. It would not prevent defendants from being wiped out financially simply by the fact of the indictment, something that would not have occurred had the government not coerced KPMG into cutting off payment of their fees. In addition, appointed counsel could be limited in their ability to mount the defenses that their clients otherwise would have presented in consequence of the need to justify expenditures to both this Court and the Court of Appeals and the risk that sufficient funds would not be available even to pay the well below market maximum hourly rates permitted under the CJA.[157]

This is not to say that attorneys appointed under the CJA inevitably could not provide the minimally effective defense that the Constitution requires. That is unclear, one way or the other. But it is to say that defendants would be wiped out financially as a result of the government's actions before they became eligible for CJA representation and that the representation they would receive in that event would be constrained in ways that would not have obtained absent the government's interference. While CJA relief would be better than nothing, it would not be the substantial equivalent of what these defendants lost as a result of the government's constitutional violations.

Accordingly, the Court turns to the impact of the government's violations on the individual defendants.

### B. Defendants Deprived of Counsel of Choice

Messrs. Gremminger, Hasting and Watson have been deprived by the government's actions of the counsel they chose. As a result of those actions, they simply lack the resources to engage the lawyers of their choice,[158] lawyers who had represented them as long as KPMG was paying the bills.

■■ Mr. Ritchie was deprived by the government's actions of the services of CWT, which was to have played an integral role in his defense.[159] The fact that

---

**156.** Nor would recourse to the CJA be equivalent as respects the defendants' interests in choosing their own counsel. Were the Court to relieve their present attorneys and appoint others, defendants would be deprived of counsel of their choosing. Were it to exercise its power to appoint their present attorneys over their attorneys' objections, as it has done in one recent case, *United States v. Stein*, 488 F.Supp.2d 370 (S.D.N.Y.2007), there almost inevitably would be tension borne of the understandable desire of counsel who ordinarily charge far higher rates than the maximum permitted under the CJA to minimize the time devoted to these clients' defenses.

**157.** CJA counsel in non-capital cases may be paid no more than $94 per hour. *See* Press Release, United States District Court, Southern District of New York (May 21, 2007), *available at* http://www1.nysd.uscourts.gov/pr 07—0521—cja.php.

**158.** Gremminger Decl. [dkt. item 1110] ¶¶ 2, 5, 7; Hasting Am. Decl. [dkt. item 1046] at 1–2; *United States v. Stein*, 488 F.Supp.2d 370, 371–72; Watson Decl. [dkt. item 1009] ¶¶ 15–17.

**159.** Half of Mr. Ritchie's defense costs are being advanced by another employer. Nevertheless, he is unable to fund even half of the cost of the defense that he would have mounted had KPMG paid his expenses. Ritchie 2d Supp. Decl. [dkt. item 1113] ¶¶ 9, 16.

he still is represented by the Arguedas firm does not render immaterial the loss of CWT. As *Stein I* held, and as the Supreme Court and the Second Circuit have recognized, a criminal defendant has a constitutional right "to control the presentation of his defense."[160] "Inherent in a defendant's right to control the presentation of his defense is the right to choose the counsel who presents it."[161] This includes the right to a second lawyer or law firm if the defendant can afford it, either from his own resources or from resources lawfully available to him from others.[162]

■ As the Supreme Court held only last year in *United States v. Gonzalez–Lopez*,[163] the unjustified denial of the right to counsel of one's choice violates the Sixth Amendment without regard to considerations of prejudice:

"Where the right to be assisted by counsel of one's choice is wrongly denied, . . . it is unnecessary to conduct an ineffec-

tiveness or prejudice inquiry to establish a Sixth Amendment violation. Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received. To argue otherwise is to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed."[164]

■ To be sure, *Gonzalez–Lopez* was a case in which a new trial, with the defendant represented by his chosen attorney, was entirely feasible, so the matter was remanded. Here, however, there are no funds to pay for these defendants' counsel of choice. Accordingly, the indictment must be dismissed as to these defendants because they have been deprived of counsel of their choice, independent of the existence of other grounds.[165]

---

**160.** *Lainfiesta v. Artuz*, 253 F.3d 151, 154 (2d Cir.2001) (citing *Herring v. New York*, 422 U.S. 853, 857, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975)), *cert. denied, Lainfiesta v. Greiner*, 535 U.S. 1019, 122 S.Ct. 1611, 152 L.Ed.2d 625 (2002).

**161.** *Id.* (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989) (acknowledging "defendant's right 'to select and be represented by one's preferred attorney'") (quoting *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)); *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (holding defendant has right to represent himself at trial)).

**162.** *See, e.g., Lainfiesta*, 253 F.3d at 154–56; *Stein I*, 435 F.Supp.2d at 367.

**163.** —— U.S. ——, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006).

**164.** *Id.* at 2563.

**165.** The Court notes that *Lainfiesta* rejected the contention that the temporary denial of a second attorney of choice, specifically the tri-

al court's refusal to permit one of the defendant's two attorneys to conduct a cross-examination of a forensic expert witness, was a structural error and applied harmless error analysis. This does not suggest a similar approach to this case.

The *Lainfiesta* panel applied harmless error analysis rather than presuming prejudice under the structural error doctrine because (1) "the error affected only the cross-examination of a single witness," (2) defendant's chosen lead counsel conducted the cross-examination with the second attorney sitting at counsel table, and (3) the second attorney was not totally unavailable to defendant because he "was accessible to [lead counsel] for consultation at all times and was never prevented from sharing his 'broader knowledge' of forensic science with him." 253 F.3d at 157–58. *Lainfiesta's* holding on this point therefore has no bearing on this case, where Mr. Ritchie has been deprived entirely of the services of CWT and the consequences of that deprivation cannot be known.

## C. The KPMG Defendants as to Whom the Government Concedes Dismissal

The government, given *Stein I*, concedes that the indictment should be dismissed also against nine other defendants: Messrs. Bickham, DeLap, Eischeid, Smith, Rosenthal, Lanning, Stein, Warley, and Wiesner. Its "given *Stein I*" hedge, however, suggests that it may renew on appeal its contention that the KPMG Defendants were obliged to demonstrate prejudice. It is unnecessary to address this point further in light of the discussion in *Stein I*. Nevertheless, the Court's finding, based on this expanded record, that all of these defendants, as well as Messrs. Gremminger, Hasting, Ritchie and Watson, have been forced by KPMG's cutoff of payment of defense costs to curtail the defenses they would have mounted had KPMG paid those costs would satisfy any requirement of prejudice.

One additional point merits brief mention. At oral argument, the Court raised, as a conceptual matter, the fact that persons facing criminal prosecution may limit the amount they spend for at least two reasons. Some lack the funds to pay for the defenses they desire. Others have the funds, but choose to spend them on other things. Hence, it perhaps would be arguable that a defendant of the second type— one who has sufficient funds to defend— should not obtain a dismissal even if the government wrongfully has prevented a third party from paying the defendant's defense costs. The injury in that case perhaps could be said to be monetary alone rather than one that would affect the ability to mount a defense of choice. But this inquiry ultimately has proved in this case to be of only academic interest.

The Court, in ruling on another motion, has found that Mr. Hasting is insolvent.[166] Mr. Watson has assets of approximately $80,000, owes his lawyers approximately $1 million, and has no regular source of income.[167] Mr. Bickham has remaining assets of less than $300,000, owes his lawyers over $600,000, and is threatened by his attorneys with a motion for leave to withdraw. Although he apparently has been able to earn significant income as a self-employed accountant, his ability to earn would be seriously compromised by the need to participate in a lengthy trial.[168] None of them can afford to defend this case at any meaningful level.

The other ten defendants as to whom the government concedes dismissal are in better financial circumstances. Their net assets range from something less than $1 million to something more than $5 million, with most being in the $1 to $3 million range.[169] There is no denying the fact that this is a great deal of money to most people. But there also is no denying that it is not sufficient for any of them to defend this case as they would have defended it absent the government's actions.

As an initial matter, some of the defendants' submissions disclose the fees and expenses, paid and unpaid, that they have incurred to date in defending this case. They range from a low of around $500,000 to a high of $3.6 million. They average roughly $1,700,000 per defendant so far.[170]

---

166. 488 F.Supp.2d at 371–72.

167. Watson Decl. [dkt. item 1009] ¶¶ 16–17, 19.

168. Bickham Decl. [dkt. item 1003] ¶¶ 7, 9–11.

169. DeLap Decl. [dkt. item 1118] ¶ 5; Eischeid Decl. [dkt. item 1117], Att.; Gremminger Decl. [dkt. item 1110] ¶ 2; Lanning Decl.

[dkt. item 1119] ¶ 7 & Sch. A; Ritchie 2d Supp. Decl. [dkt. item 1113] ¶ 16; Rosenthal Aff. [dkt. item 1116] ¶ 4; Smith Decl. [dkt. item 1108] ¶¶ 5–8; Stein Am. Decl. [dkt. item 1121] ¶ 3; Warley Aff. [dkt. item 1114] ¶¶ 9–18; Weisner Decl. [dkt. item 1109] ¶¶ 7–8.

170. Bickham Decl. [dkt. item 1003] ¶ 7; Arkin Decl. (Eischeid) [dkt. item 1117] ¶ 7 (discloses only fees already paid without stating fees incurred since Sept. 2006); Gremminger

And the most expensive part of the case—a six to eight month trial—lies ahead.

More broadly, experienced counsel have submitted estimates of the cost of defending this case, assuming that KPMG or a comparable company were paying the defense costs. These have been based both on the actual costs of prior complex white collar criminal cases in which they have been involved, albeit none so large and complex as this, and on published reports of the defense costs in other such cases. These estimates are instructive.

First, prior to oral argument, one of the defendants' attorneys submitted a declaration stating the actual cost of his defense of a much smaller white collar criminal case involving a much shorter trial and far fewer documents than this one was $3.3 million.[171] The government agreed that $3.3 million would be "a very conservative estimate" of what it would cost to defend this case.[172] The same defense attorney later estimated that the cost of defending his client in this case as he would have defended him were KPMG paying the bills would have been more than $10 million.[173] Other defense attorneys put that figure in the range of $7 to $24 million each, with the average figure being around $13 million.[174]

Second, both defendants and the government have pointed to press reports concerning defense costs in a number of recent high profile white collar prosecutions, all of which involved far fewer documents and far fewer defendants and most of which involved far shorter trials than this case will require. These have included costs of $14.9 million (Kumar—Computer Associates), $17.7 million and $8 million for each of two trials (Kozlowski—Tyco), $24 million (Shelton—Cendant), $25 million (Rigases—Adelphia), $32 million (Scrushy—HealthSouth), and $25 and $70 million (Lay and Skilling, respectively—Enron).[175]

The government was given the opportunity to comment both on defendants' estimates and on the published reports. Apart from its agreement that $3.3 million would be a "very conservative estimate" of the cost of defending this case, it has not done so. It declined also to provide its own estimate.[176] Thus, the government has elected not to contest any of the information before the Court.

---

Decl. [dkt. item 1110] ¶ 7; Hasting Am. Decl. [1046] at 2; Lanning Decl. [dkt. item 1119] ¶ 2; Rosenthal Aff. [dkt. item 1116] ¶ 6; Smith Decl. [dkt. item 1108] ¶ 4; Stein Am. Decl. [dkt. item 1121] ¶ 2; Warley Aff. [dkt. item 1114] ¶ 6; Watson Decl. [dkt. item 1009] ¶ 15; Wiesner Decl. [dkt. item 1109] ¶ 7.

171. Spears Decl. [dkt. item 1071] ¶¶ 3–10.

172. Tr., July 2, 2007, at 58:5–13.

173. Spears Decl. [dkt. item 1100] ¶¶ 7–8.

174. *See* Arkin Decl. [dkt. item 1117] ¶ 12; Gioiella Decl. [dkt. item 1095], at 1; Bauer Decl. [dkt. item 1094] ¶ 27; Necheles Decl. [dkt. item 1102] ¶ 16; Rule Decl. [dkt. item 1104] ¶ 9.

175. Strassberg Decl. [dkt. item 1105] ¶ 15.

176. Letter, John M. Hillebrecht, July 9, 2007 [dkt. item 1127]; Tr. July 2, 2007, at 58:20–59:10; Order, July 3, 2007 [dkt. item 1079].

The government's protestation of inability to do so is unconvincing. The USAO and the Department of Justice prepare budgets every year. They frequently are involved in litigation concerning attorneys' fee applications. The criminal defense bars in this and other cities are filled with former AUSAs who have intimate knowledge of the costs of defending large, document intensive criminal cases that they doubtless would have been happy to share with the government. The government, however, was within its rights in declining as a matter of policy to offer an estimate, although it of course must live with the consequences of that decision.

The Court of course understands that the estimates of defendants' counsel are subject to bias, that published reports may be inaccurate, and that any estimate inherently is uncertain. But district judges pass on fee applications all the time. They of necessity are knowledgeable about the cost of litigation.[177] Without adopting any specific figure, the Court, based on its intimate familiarity with this case, the costs actually incurred to date, the scope of the task that lies ahead, and its awareness of the market for legal services, finds that none of the thirteen KPMG Defendants as to whom the government concedes dismissal has the resources to defend this case as he or she would have defended it had KPMG been paying the cost, even if he or she liquidated all property owned by the defendant.[178]

This is not to say that the Constitution guarantees anyone charged with a crime representation by a "Dream Team" or a multimillion dollar defense. But, as *Stein I* held, it does guarantee those who can afford it the right to spend their money for the best (or, what is not always the same thing, the most expensive) defense that money can buy, free of unjustified interference by the government. It also, as a general matter, prevents the government from interfering if a criminal defendant is fortunate enough to have someone who is willing to give the defendant the money to pay for a defense, even a very expensive one. The vice of the government's actions here was that the government improperly interfered with the payment of defense costs that KPMG otherwise would have paid, just as KPMG paid for a $20 million defense for four of its personnel in the Xerox case.

## D. The Defendants as to Whom the Government Resists Dismissal

Notwithstanding its concession that dismissal is the only appropriate remedy for most of the KPMG Defendants, the government resists dismissal as to Messrs. Larson, Pfaff and Greenberg.

### 1. Defendants Pfaff and Larson

The government argues that Messrs. Pfaff and Larson, who left KPMG some time ago, did not ask KPMG to pay their defense costs until May 2006. This, the government maintains, shows that these defendants were not affected by the government's actions.[179] While the fact that the demand came late in the day is not

---

**177.** For example, under fee-shifting statutes "[i]t remains for the district court to determine what fee is 'reasonable.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This determination entails excluding "hours that were not 'reasonably expended'" and may involve considering "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Id.* at 430 n. 3, 434, 103 S.Ct. 1933.

**178.** All of the figures, including that which the government agrees would be "a very conservative estimate" of the cost of defending this case, are astonishingly large, not in the sense that they are not credible, but for what they say about the cost of justice in our society and about the disparity between those with means and those without. Both are subjects that warrant careful attention by anyone concerned with the overall fairness, accessability and legitimacy of our judicial system. In deciding a given case, however, any court must deal with the reality that exists.

**179.** *See* Tr., July 2, 2007, at 52:5–54:19.

persuasive, the government's argument draws attention to significant facts.

Messrs. Pfaff and Larson left KPMG in 1997 and formed a limited liability company,[180] Presidio, that played a central role in transactions at issue here. While the government acknowledges that the indictment embraces some conduct in which Pfaff and Larson allegedly engaged while still at KPMG, it asserts that a majority took place after they had left the firm.[181] Pfaff and Larson do not dispute this although they point out that the allegations of their post-KPMG employment activities relate back to a conspiracy allegedly formed earlier and that they are responsible in law for the acts of co-conspirators still employed by KPMG after Pfaff and Larson left.[182]

■ While an insurer has a duty to defend an insured against the entirety of an action in which the complaint asserts any claim that potentially is covered by the policy,[183] it has not been determined whether KPMG had a contractual or other legal obligation to defend. It is even less clear that it would have paid Pfaff's and Larson's defense costs, as a matter either of grace or of obligation, given that Pfaff and Larson left the firm so long ago and that a majority of their alleged conduct occurred after they left the firm. In consequence, Messrs. Pfaff and Larson have failed to establish a likelihood that the government's actions interfered with their ability to defend themselves.

### 2. Defendant Greenberg

Mr. Greenberg is differently situated from all of the other KPMG Defendants. He parted with the firm two years before the indictment in strained circumstances, entered into a settlement agreement pursuant to which he received a substantial payment, and gave KPMG a release.[184]

■ Greenberg released KPMG "from any and all causes of action, ... *contracts*, ... claims, liabilities, ... and demands, known or unknown, suspected to exist or not suspected to exist, anticipated or not anticipated, ... which Greenberg ha[d] or may have against [it] ... by reason of any and all acts, omissions, events or facts occurring or existing prior to the date hereof as it relates to Greenberg's membership in KPMG and his resignation from that partnership...."[185] This clearly and unambiguously released any claim by Greenberg that KPMG was obligated to indemnify him or advance his defense costs pursuant to any contract, express or implied, that arose in connection with his employment.[186]

To be sure, the release did not foreclose the possibility that Mr. Greenberg, absent the government's interference, would have sought payment from KPMG, either as a

---

180. Superseding indictment [dkt. item 57] ¶ 13.

181. Govt. Mem. [dkt. item 1051] 39.

182. Pfaff–Larson Reply Mem. [dkt. item 1061] 6–7.

183. *Buss v. Superior Court*, 16 Cal.4th 35, 47–48, 65 Cal.Rptr.2d 366, 939 P.2d 766, 774–75 (1997). (Pfaff and Larson worked in KPMG's San Francisco office).

184. Pitofsky Decl. [dkt. item 763] Ex. B, ¶¶ 2, 8.

185. *Id.* at ¶ 8 (emphasis added).

186. This issue was fully briefed and ripe for decision on a motion by KPMG in the ancillary proceeding for partial summary judgment dismissing, among other things, Mr. Greenberg's contract claim for advancement of defense costs. The decision granting that aspect of the motion was on the verge of being filed when the Second Circuit stayed that proceeding.

matter of grace or pursuant to California statutes.[187] Given the circumstances of his departure,[188] however, the Court is not persuaded that KPMG would have paid his defense costs even in the absence of government interference.[189]

### VI. Conclusion

For the reasons set forth above and in previous opinions, the motions of defendants Bickham, DeLap, Eischeid, Gremminger, Hasting, Lanning, Ritchie, Rosenthal, Smith, Stein, Warley, Watson, and Wiesner to dismiss the indictment are granted. The motions of defendants Greenberg, Pfaff and Larson are denied.

The Court has reached this conclusion only after pursuing every alternative short of dismissal and only with the greatest reluctance. This indictment charges serious crimes. They should have been decided on the merits as to every defendant. The Court well understands, moreover, that prosecutors can and should be aggressive in the pursuit of the public interest. It respects the distinguished record of the United States Attorney's Office for the Southern District of New York, which long has been, and continues to be, a model for the nation.[190] But there are limits on the permissible actions of even the best prosecutors. As the Supreme Court wrote long ago, a prosecutor

"is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." [191]

The Department of Justice, in promulgating the aspects of the Thompson Memorandum here at issue, and the USAO in the respects discussed above and in *Stein I*, deliberately or callously prevented many of these defendants from obtaining funds for their defense that they lawfully would have had absent the government's interference. They thereby foreclosed these defendants from presenting the defenses they wished to present and, in some cases, even deprived them of counsel of their choice. This is intolerable in a society that

---

187. CAL. LAB.CODE § 2802(a) (requirement of indemnification); CAL. CIV.CODE § 2778 (indemnification includes defense costs); *Jacobus v. Krambo Corp.*, 78 Cal.App.4th 1096, 93 Cal.Rptr.2d 425 (Cal.Ct.App.2000) (LAB.CODE § 2802 requires employer to defend or pay defense costs); *Alberts v. Am. Cas. Co.*, 88 Cal.App.2d 891, 899, 200 P.2d 37, 42–43 (Cal. Ct.App.1948) (indemnitee may be entitled to recover as soon as it becomes liable). Under CAL. LAB.CODE § 2804, the release Greenberg signed was not effective to release his statutory rights.

188. KPMG distrusted Mr. Greenberg. *See* Pitofsky Decl. [dkt. item 763] Ex. G; Greenberg Rule 56.1 St. [dkt. item 763–10] ¶ 11. The

settlement agreement, moreover, evidences a desire on the part of KPMG to be done with Mr. Greenberg, once and for all.

189. It is unnecessary to determine whether this conclusion means that the constitutional rights of Messrs. Greenberg, Pfaff and Larson were not violated or only that dismissal is not an appropriate remedy.

190. *See generally* Lewis A. Kaplan, *Henry L. Stimson Award Ceremony: Remarks,* 54 RECORD OF THE ASS'N OF THE BAR OF THE CITY OF NEW YORK 421 (1999).

191. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

holds itself out to the world as a paragon of justice. The responsibility for the dismissal of this indictment as to thirteen defendants lies with the government.

The foregoing supplements the findings of fact and conclusions of law previously made in this matter.

SO ORDERED.